# Illinois Official Reports

## Appellate Court

---

### *In re P.S.*, 2021 IL App (5th) 210027

---

| | |
|---|---|
| Appellate Court Caption | *In re* P.S. and A.S., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Charlie S., Respondent-Appellant). |
| District & No. | Fifth District<br>Nos. 5-21-0027, 5-21-0028 cons. |
| Filed | July 26, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Madison County, Nos. 19-JA-75, 19-JA-76; the Hon. Martin J. Mengarelli, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Anthony G.M. Swarringin, of Edwardsville, for appellant.<br><br>Thomas A. Haine, State's Attorney, of Edwardsville (Patrick Delfino and Jennifer L. Camden, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CATES delivered the judgment of the court, with opinion.<br>Justice Welch concurred in the judgment and opinion.<br>Justice Wharton dissented, with opinion. |

**OPINION**

¶ 1        Respondent, Charlie S. (Father), appeals from the judgment of the circuit court of Madison County terminating his parental rights to his two minor children, P.S. and A.S. For the following reasons, we affirm.

¶ 2        P.S. and A.S. are the biological children of Father and Amanda H. (Mother), who is not a party to this appeal. P.S. was born on October 31, 2014. On February 1, 2019, Mother gave birth to A.S., whose meconium tested positive for methamphetamines, amphetamines, and marijuana. Mother admitted to using methamphetamine and marijuana while pregnant and tested positive for both substances. The Illinois Department of Children and Family Services (DCFS) conducted an investigation, during which Mother agreed to DCFS initiating intact family services.

¶ 3        On April 18, 2019, the State filed petitions for adjudication of wardship of the minors under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)). In the petitions, the State alleged that the minors were neglected because their environment was injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2018)) and A.S. had methamphetamines, amphetamines, and marijuana in his system at birth (705 ILCS 405/2-3(1)(c) (West 2018)). The petitions alleged that (1) Mother had a substance abuse addiction that impaired her ability to adequately care for the minors; (2) Father had a criminal history including, but not limited to, criminal convictions for aggravated battery to a pregnant person and domestic battery; (3) Mother had pending charges for battery and domestic battery and an active warrant for her arrest; and (4) A.S. was born with methamphetamines, amphetamines, and marijuana in his system, and Mother admitted to using said substances during her pregnancy.

¶ 4        On July 25, 2019, the children were taken into protective custody, and shelter care hearings were conducted on July 25, 2019, and July 30, 2019. On the day of the first shelter care hearing, Father tested positive for methamphetamine. Following the hearings, the trial court found there was probable cause to believe the children were neglected as defined by the Act. The children were removed from their parents' custody, and temporary custody was given to DCFS.

¶ 5        On October 1, 2019, the court adjudicated the minors neglected and made them wards of the court. The court found that Mother admitted to using methamphetamine and marijuana while pregnant and that A.S. was born with these substances in his system. The court also found that Mother's substance abuse impaired her ability to adequately care for the minors, that Father had two criminal convictions for battery, and that Mother had pending criminal charges for battery and an active warrant for her arrest.

¶ 6        On August 4, 2020, the State filed petitions to terminate Father's parental rights to the children. The petitions alleged that Father was unfit based on three statutory grounds: (1) he failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children (750 ILCS 50/1(D)(b) (West 2020)); (2) he failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following the adjudication of neglect, specifically October 1, 2019, through the date of the filing of the petitions (750 ILCS 50/1(D)(m)(i) (West 2020)); and (3) he failed to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect, specifically October 1, 2019, through the date of the of the filing of the petitions (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 7        On November 24, 2020, the court called the cause for a fitness hearing. The proceedings were conducted in open court, via Zoom, a video conferencing platform. At the start of the hearing, Father's counsel made an oral motion to continue the case until an in-person hearing could be conducted at some later date. The State requested that the case proceed over Zoom. Mother's counsel stated that Mother would prefer an in-person hearing but had not expressed any concerns about proceeding via Zoom. The court denied Father's motion to continue. Father then made a motion to have an emergency, in-person hearing that day, which the court denied.

¶ 8        At the fitness hearing, Gretchen Truax testified that she was assigned as the family's caseworker in August 2019. Truax testified that after Mother gave birth to A.S., both Mother and A.S. tested positive for amphetamines and methamphetamines. Thereafter, DCFS was contacted and conducted an investigation. During the investigation, Mother admitted to using controlled substances during her pregnancy, but Father denied any substance abuse. DCFS also learned that the family had a history of domestic violence. Mother agreed to DCFS initiating intact family services. An intact family service plan was created in April 2019, but conditions required the children to be taken into DCFS care in July 2019.

¶ 9        In August 2019, after the children were taken into care, Truax created a service plan, which she reviewed every six months. Father's initial service plan included the following tasks: (1) complete a substance abuse assessment and follow any recommendations, (2) complete a mental health assessment and follow any recommendations, (3) complete a domestic violence assessment and follow any recommendations, and (4) cooperate with DCFS. Truax testified that Father's most recent service plan was created in June 2020 and included the same tasks. Truax testified that, as of her last review, Father had not made any progress on his service plan.

¶ 10       Truax referred Father to Chestnut Health System (Chestnut) early in the case, and Father had repeatedly advised Truax that he had made an appointment to complete his assessment. Truax stated that when she would follow up with Father, he would always have some excuse for having missed the appointment. Father completed his first assessment in January 2020, and Chestnut recommended that Father engage in outpatient treatment with group and individual sessions. Father did not attend these sessions and was unsuccessfully discharged from the program in February 2020. Truax re-referred Father to Chestnut, and he completed a new assessment in April 2020. Chestnut again recommended that Father complete outpatient services. Father did not attend the sessions, and he was unsuccessfully discharged a second time. Truax referred Father to Chestnut a third time, but Father did not complete that assessment. Truax testified that Father checked himself into Chestnut's seven-day crisis unit on two occasions. Both times, Father checked himself out, against the advice of the staff, before completing the seven-day treatment.

¶ 11       Truax testified that Father began looking into inpatient substance abuse treatment in July 2020, and that he was put on a waiting list at Gateway Rehabilitation Center (Gateway). Truax did not know if the wait time for Gateway's inpatient program was impacted by the ongoing coronavirus (or COVID-19) pandemic caused by severe acute respiratory syndrome coronavirus 2. Father was admitted to Gateway in October 2020 and was successfully released from the program in the beginning of November. Gateway recommended that Father complete outpatient treatment and referred him to Chestnut. Father completed this assessment at Chestnut on November 17, 2020, which again recommended that he complete group and individual sessions. Truax testified that Father indicated that he was going to start treatment at Chestnut the week of the termination hearing.

¶ 12    Truax testified that Father tested positive for methamphetamines and amphetamines on September 30, 2019; January 22, 2020; February 19, 2020; February 26, 2020; and March 11, 2020. Father failed to appear for drug testing on December 23, 2019; January 8, 2020; June 17, 2020; July 24, 2020; September 18, 2020; and October 7, 2020. Father tested negative for substances on May 28, 2020. Truax testified there were two gaps in drug testing for Father, one between September 30, 2019, and December 23, 2019, and another between March 11, 2020, and May 28, 2020. With regard to the first gap, Truax testified she did not request drug tests from Father during this period because Father indicated that he was going to engage in substance abuse services with Chestnut and Chestnut would have tested Father. When Truax realized that Father was not engaged in services, she started referring Father to drug tests again. Truax explained that the second gap was due to the regular testing facility temporarily closing due to the coronavirus pandemic.

¶ 13    Father's service plan also recommended that he complete a mental health assessment and follow any recommendations from the assessment. Truax testified that she referred Father to Chestnut for a mental health assessment. Father advised Truax that he wanted to focus on his substance abuse first, so he did not complete the mental health assessment until April 2020. Chestnut recommended that Father complete outpatient services, but Father did not complete the services and he was unsuccessfully discharged from the program. Truax stated that Father completed a mental health assessment while he was at Gateway in October or November 2020. Gateway recommended Father seek medication and services to alleviate his anxiety, and referred him to Chestnut. Truax testified that Father was currently "working on getting an assessment" at Chestnut but that she was not sure if he had an appointment scheduled.

¶ 14    Truax also testified there were also concerns about domestic violence in the home. Father had a prior conviction for battery against a pregnant woman, and Father did not complete the recommended domestic violence classes ordered as a condition of his probation. Truax stated there were also numerous instances of domestic violence between Mother and Father while the children were in their parents' care. Truax testified that P.S. described in detail instances of domestic violence that she witnessed between the parents. Truax testified that Father indicated that he wanted to address his substance abuse before his domestic violence issues. Based on the amount of domestic violence present in Mother and Father's relationship, however, it was determined that Father should not wait to begin domestic violence services.

¶ 15    Truax testified that she referred Father to Group Interventions in order to complete a domestic violence assessment. Father contacted the coordinator on several occasions but failed to show up for any of the appointments. In February 2020, as a result of the missed appointments, Group Interventions indicated that it would no longer make space available for Father to participate in the program. In April 2020, Truax referred Father to Alternatives Counseling to complete an assessment. Father again failed to appear for the appointment. The assessor, however, used the information Father provided over the phone during the initial intake call and recommended that Father complete 26 weeks of sessions. Truax advised Father of the recommendation, but Father did not attend these sessions and he was unsuccessfully discharged from the program. Truax testified that she re-referred Father to Group Intervention and that she believes Father has recently taken some initial steps to engage in the program.

¶ 16    Truax testified that Father has been cooperative with DCFS and respectful to her as the caseworker. She stated that she referred Father to services numerous times but that he has not taken the service plan seriously, which has been the barrier to Father's progress. Truax testified

that Father always had excuses, throughout the entirety of the case, for his failure to follow through with starting recommended services or attending appointments. Truax testified that the parents were permitted one hour of supervised visitation per week, which they regularly attended. Truax testified the parents interacted appropriately with the children during the visits, and that Father was very good at making the children laugh.

¶ 17   During cross-examination, Truax testified that the coronavirus pandemic caused some restrictions to be put into place beginning in the third week of March 2020. Truax stated it took approximately two weeks for providers to figure out how to function during the pandemic and that providers had made the necessary adjustments by mid-April. Truax explained that the pandemic complicated visitation because the visits had to be conducted over the telephone instead of in person. With regard to the provision of services, Truax testified the pandemic actually reduced barriers to obtaining services and made some services more readily available than in the past. Truax stated that, for the first time, service providers conducted assessments over the phone and allowed clients to participate in group and individual counseling over the phone or through video conferences. Truax stated she communicated with the parents in early April 2020, and she was able to refer them to remote services within 7 to 10 days.

¶ 18   Father did not testify at the fitness hearing. At the conclusion of the evidence, the court made a verbal finding that the State had proven by clear and convincing evidence that Father was an unfit person for failing to make reasonable efforts to correct the conditions that were the basis for removal of the minors during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2020)) and that he failed to make reasonable progress toward the return of the minors in any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)). The court found that while Father was currently engaged in services, he did not engage in services or make any progress on his service plan during the relevant time period.

¶ 19   The court then immediately proceeded to the best interests hearing. Father requested a continuance of the best interests hearing so that an in-person hearing could be conducted. The court denied Father's motion and took judicial notice of the evidence presented during the fitness hearing.

¶ 20   At the best interests hearing, Truax testified that the children have been in their current placement since March 2020. The foster parents also have a 16-year-old daughter whom they adopted at birth. Truax testified the foster parents have completed the DCFS training for foster parents and their background checks. One of the foster parents works full time while the other stays home to care for the children. Truax testified the children are thriving in their placement, as the foster parents have devoted a large amount of attention to the children's needs. A.S. was born premature and previously struggled to gain weight and to advance his gross and fine motor skills. Under the foster parents' care, A.S. has gained weight and he received early intervention screening to improve his motor skills. P.S. is doing well in school but suffers from anxiety and is in counseling. The foster parents have worked to develop an understanding of her condition and have followed the recommendations of P.S.'s counselor in order to support the child's needs. P.S. feels safe in the foster parents' home and has expressed the desire to stay with, and be adopted by, the foster parents. The foster parents want to adopt the minors and have signed permanency commitments. Truax testified she believes the foster parents will continue to be supportive of the children's needs in the future and will treat the children as their own.

¶ 21 Truax testified the children are excited for their visits with Mother and Father, but that P.S. has begun experiencing anxiety leading up to, and after, the visits with her parents. Truax testified that P.S. began expressing a desire not to attend the visits near the end of June 2020. Truax testified that P.S. has stated that she is relieved when a visit is cancelled. P.S. has indicated, however, that she would like to continue to have visits with her parents even if she is adopted by the foster parents. Truax testified that A.S. fusses whenever he leaves the foster parents, which he does not do when he leaves visits with his parents. Truax believed that A.S. had an increased level of attachment to the foster parents over his parents. Truax testified that she believed it would be in the best interest of the children for the parental rights to be terminated.

¶ 22 During cross-examination, Truax testified that she did not believe that more than one hour of visitation per week would have been beneficial because the visits cause P.S. to experience increased anxiety. Truax testified that while P.S. and her parents clearly love each other and are bonded to each other, P.S.'s comments indicate that she did not always feel safe living with her parents. Truax stated she had concerns about the parents' ability to meet the needs of the children due to the parents' continued use of controlled substances and their failure to recognize that their personal choices impacted the children. Truax was also concerned that the parents would not keep up with the children's counseling and therapy appointments because the parents frequently did not keep their own appointments.

¶ 23 Father testified that he was currently working as a forklift driver. Father stated that before DCFS removed the children from the home, he had been a stay-at-home father and that he and P.S. had a great relationship. Father testified that he had three adult children that he had helped raise. Father disagreed with Truax's testimony that P.S. did not want to participate in visits. Father testified that he and P.S. had good conversations and that she spoke with him on the phone for an hour. After Father testified, the guardian *ad litem* (GAL) advised the court that she believed it was in the best interests of the children to terminate the parental rights.

¶ 24 The court entered a verbal finding that it was in the children's best interests that Father's parental rights be terminated. That same day, the court entered a written order terminating Father's parental rights. The court found, by clear and convincing evidence, that Father failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the home during any nine-month period following the adjudication of neglect, and that Father failed to make reasonable progress toward the return of the children to the home during any nine-month period following the adjudication of neglect. The court also found, by a preponderance of the evidence, that termination of Father's parental rights was in the best interests of the minors. The court found the minors were strongly bonded to their foster family and that their needs were being met in the foster home. The court found that the foster parents wished to adopt the minors and had signed permanency commitments.

¶ 25 On December 23, 2020, Father filed a posttrial motion to reconsider. In the motion, Father argued the trial court erred in denying his motion to continue the hearings because the court "denied Father's right to an in-person trial." The court denied Father's motion, and this appeal follows.

¶ 26                                                    ANALYSIS

¶ 27 Prior to discussing respondent's contentions on appeal, we briefly address the timeliness of our decision. This case has been designated as accelerated pursuant to Illinois Supreme

Court Rule 311 (eff. July 1, 2018). Rule 311(a)(5) provides, in part, that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). The 150-day deadline expired on June 28, 2021. In this case, Father requested three extensions of time to file his opening brief, and the case was not docketed until June 8, 2021. Furthermore, because the case involves the application of a recently revised Illinois Supreme Court rule and due process issues, we find good cause for issuing our decision after the 150-day deadline. See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 28                    The Trial Court's Termination of Father's Parental Rights

¶ 29    On appeal, Father argues the trial court's determinations that he was unfit and that the termination of his parental rights was in the best interests of the children were against the manifest weight of the evidence. We disagree.

¶ 30    Section 2-29(2) of the Act sets forth a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). First, the State must prove by clear and convincing evidence that the parent is an unfit person as defined by the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent to be unfit, the court must then determine whether the State has proven, by a preponderance of the evidence, that it is in the child's best interest that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). During the second stage of the proceedings, the focus of the court's scrutiny shifts from the rights of the parents to the best interests of the child. *In re B.B.*, 386 Ill. App. 3d 686, 697 (2008).

¶ 31    The trial court's decision to terminate parental rights involves factual findings and credibility assessments which, on review, are accorded great deference. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). On appeal, the trial court's findings of parental unfitness and that termination of parental rights was in the child's best interests will not be disturbed unless they are contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998, 1001 (2004).

¶ 32                              Determination of Unfitness

¶ 33    Here, the trial court concluded that the State had successfully proven two grounds of unfitness against Father. The court found that Father failed to make reasonable efforts to correct the conditions that were the basis for removal of the minors during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2020)) and that he failed to make reasonable progress toward the return of the minors in any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 34    "Reasonable effort" is a subjective standard and refers to the amount of effort reasonable for the particular parent. *In re R.L.*, 352 Ill. App. 3d at 998. The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. In this case, the conditions that were the basis for the removal of the children from the home were that their parents had issues with substance abuse which impaired their ability to adequately care for the minors, and there were concerns about domestic violence in the home.

¶ 35     On appeal, Father argues that it was not possible for him to have completed his service plan in nine months, given his ongoing addiction during the coronavirus pandemic. Father contends the nine-month period for assessment "should have been extended to account for the interference of the COVID-19 pandemic." Father's contention that the coronavirus pandemic interfered with his efforts to correct the conditions that led to the removal of the children is unsupported by any evidence in the record. Instead, the evidence was that, absent a two-week transition period at the beginning of the pandemic in March 2020, services were more readily available than in the past.

¶ 36     Father was repeatedly referred to substance abuse, domestic violence, and mental health services. Although Father made numerous appointments for services, he chronically failed to appear for his appointments or to follow through on recommendations. Father made almost no effort to correct the conditions that led to the removal of the children until the State sought to terminate his parental rights in August 2020. Based on the evidence, the trial court's determination that Father was unfit for failing to make reasonable efforts to correct the conditions that were the basis for removal of the minors during any nine-month period following the adjudication of neglect was not against the manifest weight of the evidence.

¶ 37     The trial court also did not err in finding that Father was unfit for failing to make reasonable progress toward the return of the minors in any nine-month period following the adjudication of neglect. "Reasonable progress" is an objective standard and is based upon the amount of progress as measured from the conditions existing at the time of removal. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. Reasonable progress requires a measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. A parent has made "reasonable progress" when the trial court can conclude that it will be able to return the child to parental custody in the near future. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. If a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, a "failure to make reasonable progress" includes a parent's failure to substantially fulfill his obligations under the service plan. 750 ILCS 50/1(D)(m) (West 2020).

¶ 38     Father's first service plan was created in August 2019, shortly after the children came into DCFS care. Father's service plan was revisited every six months, with the tasks remaining the same throughout the case. Father's last service plan, created in June 2020, included the following tasks: (1) complete a substance abuse assessment and follow any recommendations, (2) complete a mental health assessment and follow any recommendations, (3) complete a domestic violence assessment and follow any recommendations, and (4) cooperate with DCFS. While Father cooperated with DCFS, Father failed to make significant progress on any of the other tasks in his service plan between October 1, 2019, and August 4, 2020.

¶ 39     Father tested positive for controlled substances on five occasions and missed six scheduled drugs tests between September 2019 and October 2020. Father completed substance abuse assessments at Chestnut in January and April 2020 but did not complete the treatment recommended. Father did not successfully complete any substance abuse treatment until November 2020, well after the relevant nine-month time period had passed. As of the date of the termination hearing, Father had not yet followed up with outpatient treatment, as requested.

¶ 40     Father also failed to follow through on his tasks regarding treatment for his mental health and domestic violence issues. Although Father completed mental health assessments in April 2020 and in October or November 2020, Father failed to complete the recommended treatment.

Father repeatedly failed to appear for appointments to complete an assessment regarding his issues with domestic violence. In April 2020, one program used the information Father provided over the phone as part of its intake procedure to provide Father with a treatment plan, but Father failed to complete any of the recommended treatment. The overwhelming evidence was that Father failed to make any measurable movement toward reunification between October 1, 2019, and August 4, 2020. Based on the evidence presented, the trial court's finding that Father was unfit for failing to make reasonable progress toward the return of the minors was not against the manifest weight of the evidence.

¶ 41                    Determination of the Children's Best Interests

¶ 42    Once a parent has been found to be unfit, the parent's rights yield to the child's best interests. *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002). Again, this court will not reverse the trial court's determination as to the child's best interests unless it is contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d at 1001.

¶ 43    The record clearly reveals Father's lack of effort and progress to complete the objectives of his service plan, in particular his failure to seek treatment for his substance abuse, mental health issues, and perpetuation of domestic violence. The caseworker's concerns about Father's ability or willingness to keep up with the children's appointments were valid in light of his failure to follow through with his own service plan tasks. By contrast, the children were thriving in their foster home due to the foster parents' dedication to meeting the needs of the children. P.S. feels safe in the foster home, a feeling she did not have while living with her parents. The children are strongly bonded to their foster family, and the foster parents wish to adopt the children. Based on the circumstances presented, the trial court's determination that termination of Father's parental rights was in the best interests of the children was not contrary to the manifest weight of the evidence.

¶ 44            Denial of Father's Motions to Continue or for an In-Person Hearing

¶ 45    On November 24, 2020, the trial court called the case for the fitness and best interests hearings. The proceedings were conducted in open court, via the video conferencing platform Zoom. The judge, the GAL, the parties, and counsel for the attorneys and DCFS were all present on the video call. The record suggests that each of the participants were in separate locations, with the exception of the parents, who were together in the same "breakout room."[1] It is unclear from the record when, but at some point, the caseworker was also included in the call so that she could testify.

¶ 46    At the start of the hearing, Father's counsel stated that Father did not consent to a videoconference hearing and made an oral motion to continue the case until an in-person

---

[1]The Zoom videoconferencing platform allows participants to be placed in "breakout rooms." Breakout rooms are sessions that are split off from the main Zoom meeting. They allow the participants to meet in smaller groups, and are isolated in terms of audio and video from the main session. Breakout rooms can be used for collaboration of one or more individuals. *Participating in Breakout Rooms*, Zoom Help Center (Mar. 25, 2021), https://support.zoom.us/hc/en-us/articles/115005769646-Participating-in-breakout-rooms [https://perma.cc/3RNE-DXUH]. In the courtroom setting, the breakout room can serve as a room where a party can confer with his or her attorney or a witness can wait to testify, without having access to the main meeting.

hearing could be conducted. Father indicated that the cause had originally been set for an in-person hearing but was reset for a Zoom hearing because the Madison County courts were not conducting in-person hearings, except in emergency situations, due to the ongoing coronavirus pandemic. Counsel indicated that it was counsel's preference and Father's "preference" to have the hearing in person, "[g]iven the difference in cross examining the witnesses." Counsel argued that an in-person hearing would allow the participants to "see the witness, *** see what the witness is doing, [and] who the witness is with."

¶ 47    The State requested that the case proceed over the Zoom videoconference platform, given the parents' lack of progress on services, the length of time the case had been pending, and Zoom's capability to allow the parties to confer privately with their counsel in a breakout room. Mother's counsel stated that Mother would prefer an in-person hearing, but that she had not expressed any concerns about proceeding via Zoom.

¶ 48    The trial court denied Father's motion to continue. The court noted that it was a bench trial and found that the parents' constitutionally protected rights would not be infringed by going forward with a hearing held via videoconference. The court stated that, most importantly, it did not believe that permanency for the children should be further delayed. Father's counsel then made a motion to have an emergency, in-person hearing that day. The court denied Father's motion.

¶ 49    During the hearings, counsel requested the opportunity to confer with Father four times: (1) during Truax's testimony at the fitness hearing, (2) before counsel's cross-examination of Truax at the fitness hearing, (3) after the State rested during the fitness hearing and before counsel announced that Father would not testify, and (4) after the State rested during the best interests hearing and before counsel announced Father would testify. During each conference, Father and Mother were placed in a breakout room with their attorneys. The court also advised the parties to write down any thoughts or issues they had during the course of the proceedings so that they could be addressed with their attorneys during the breaks.

¶ 50    Early in the fitness hearing, while the State was questioning Truax regarding Mother's service plan, Father's counsel objected, indicating that Truax appeared to be looking down at something while testifying. The court instructed Truax not to refer to any notes or documents unless requested to do so. During Father's testimony at the best interest hearing, the State interjected, stating counsel could hear Mother speaking in the background. The court advised Mother that she could be in the room while Father testified, but that she was not to provide him with any answers to the questions and that she would need to testify separately if she wanted to speak.

¶ 51    On appeal, Father argues the trial court abused its discretion by denying his motion to continue the termination hearings and, alternatively, in denying Father's motion for an immediate in-person hearing. Father argues the trial court's actions denied Father his "right to an in-person hearing" and violated his "due process right to appear personally at all stages of the proceeding." Father contends he was prejudiced by the trial court's decision to conduct the hearings via videoconference.

¶ 52    A parent has a fundamental liberty interest, protected by the due process clause of the fourteenth amendment, in maintaining a parental relationship with his or her child. *In re D.R.*, 307 Ill. App. 3d 478, 482 (1999). To protect this interest, parents are entitled to certain due process safeguards in actions to terminate their parental rights. *In re D.R.*, 307 Ill. App. 3d at 482. These safeguards include the right to be present, to be heard, to present evidence material

to the proceedings, and to cross-examine witnesses. *In re D.R.*, 307 Ill. App. 3d at 482; 705 ILCS 405/1-5(1) (West 2020).

¶ 53    The respondent does not have an absolute right to a continuance in a proceeding under the Act. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 31. Whether to grant or deny a motion to continue in a proceeding under the Act is a matter within the trial court's discretion. *In re C.L.T.*, 302 Ill. App. 3d 770, 778 (1999). We will not overturn the trial court's decision absent manifest abuse or palpable injustice. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 31.

¶ 54    Illinois Supreme Court Rule 241 (eff. May 22, 2020) provides that "[t]he court may, upon request or on its own order, for good cause shown and upon appropriate safeguards, allow a case participant to testify or otherwise participate in a civil trial or evidentiary hearing by video conferencing from a remote location." A "case participant includes any individual involved in a civil case including the judge presiding over the case, parties, lawyers, guardians *ad litem*, minors in the care of [DFCS], witnesses, experts, interpreters, treatment providers, law enforcement officers, DCFS caseworkers, and court reporters." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020). "Good cause is likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident, illness, or limited court operations, but also in foreseeable circumstances such as residing out of state." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020). The rule requires that adequate safeguard be taken to "ensure accurate identification of the case participant testifying remotely and to avoid improper influences by any individual who may be present with the case participant at the time of the testimony." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020).

¶ 55    The trial court should consider and weigh a multitude of factors when assessing whether it is appropriate to admit video testimony. The committee comments provide that the court

> "should take into consideration and balance any due process concerns, the ability to questions witnesses, hardships that would prevent the case participant from appearing in person, the type of case, any prejudice to the parties if testimony occurred by video conference, and any other issues of fairness. A court must balance these and other relevant factors in an individual case." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020).

¶ 56    On appeal, Father indicates his belief that the question of whether a parent has a right to demand an in-person hearing during proceedings to terminate parent rights is an issue of first impression. Father, however, provides this court with no analysis as to his belief regarding the nature of this alleged right to be personally present. Instead, he baldly asserts that he has a "right to an in-person hearing" and that the denial of this "right" violates his "due process right to appear personally at all stages of the proceeding." Father does not provide this court with any analysis of Rule 241, the interplay between Rule 241 and his alleged due process right to an in-person hearing, or how conducting the hearing via a videoconferencing platform interfered with his due process right to be present at the proceeding.

¶ 57    Illinois Supreme Court Rule 341 (eff. May 25, 2018) sets forth requirements for appellate briefs. Ill. S. Ct. R. 341 (eff. May 25, 2018). Rule 341(h)(7) provides that the argument portion of the appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citations to the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). "A reviewing court is entitled to the benefit of clearly defined issues with pertinent authority cited and a cohesive legal argument. *** The appellate court is not a depository in which an appellant may dump the entire matter of argument and research." *Wing*

*v. Chicago Transit Authority*, 2016 IL App (1st) 153517, ¶ 11. Arguments that are not supported by citations to legal authority do not meet the requirements of Rule 341(h)(7) and are procedurally defaulted on appeal. *Wing*, 2016 IL App (1st) 153517, ¶ 11; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not argued are forfeited on appeal). Therefore, Father has forfeited this claim on appeal.

¶ 58     Father also forfeited this claim by failing to raise it in the trial court. *Bank of New York Mellon v. Rogers*, 2016 IL App (2d) 150712, ¶ 32 (issues not raised in the trial court are forfeited on appeal); *Fawcett v. Reinertsen*, 131 Ill. 2d 380, 386 (1989) (holding that issues not raised in the trial court, even constitutional matters, are generally considered to be forfeited on appeal). At the hearing, Father's only stated reason for the motion to continue was a "preference" for an in-person hearing due to the "difference[s] in cross examining the witnesses" and the ability to observe the witness and the witness's surroundings. At no time during the hearing did Father assert that he had a due process right to an in-person hearing. The first mention of any alleged "right" to an in-person hearing appeared in Father's posttrial motion to reconsider. Father's entire argument on this issue constituted the single statement that, "[i]n denying Father's motion [to continue], [the court] denied Father's right to an in-person trial." As such, Father's contention that he had "due process" right to an in-person hearing, and that the trial court's denial of his motion to continue violated this right, have been forfeited on appeal.

¶ 59     Despite this forfeiture, the record demonstrates that the trial court allowed all of the case participants to testify or participate in the hearing remotely via a videoconferencing platform because court operations were limited in Madison County due to the public health concerns presented by the ongoing coronavirus pandemic. The committee comments to Rule 241 specifically indicate that "limited court operations" can constitute "good cause" for proceeding under the rule. In denying Father's motions, the court considered Father's concerns regarding examination of the witnesses, the parents' due process rights, the court's role in judging the credibility of the witnesses and weighing the evidence, and the children's need for permanence.

¶ 60     During the proceeding, the court took steps to safeguard the integrity of the proceeding and the parties' rights. The court repeatedly stopped the proceedings so that the parties could privately confer with their attorneys. When the circumstances were brought to the court's attention, the trial judge admonished one witness not to refer to documents unless requested and admonished Mother not to provide prompts to Father during his testimony.

¶ 61     Notably, the committee comments anticipated that these specific issues may arise when admitting testimony remotely. The committee comments indicate that the attorneys have an ethical obligation to instruct the case participants that they represent that (1) he or she may not communicate with anyone during their testimony except the examining attorney and the court reporter, and (2) he or she may not consult any written, printed, or electronic information during the examination other than information provided by the examining attorney. See Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020). While a trial judge could also offer blanket admonishments regarding these issues prior to the taking of any testimony, in this case none of the parties requested that the court do so, and the curative measures employed by the trial court when those issues arose were appropriate and sufficient safeguards under the circumstances.

¶ 62     While videoconferencing in civil proceedings is relatively new, our supreme court has spoken on the use of videoconferencing by amending Rule 241. Our trial courts are now

- 12 -

experimenting with technology that allows for private conferences between a party and his or her attorney, private waiting rooms for witnesses so that testimony is not compromised, and other methodologies that enhance the taking of testimony remotely. We find the circuit court used the Zoom videoconference platform to conduct a hearing that protected the rights of the parties, as well as the integrity of the judicial process.

¶ 63        Further, we find that Father has failed to demonstrate that he had a right to demand an in-person hearing during the termination proceedings in this case. Father has failed to demonstrate that the trial court's decision to conduct the proceeding via a videoconferencing platform, consistent with Rule 241, violated Father's right to personally appear at the termination proceeding. Even though Father was not able to be in the same physical space as every other participant at the hearing, the videoconferencing platform allowed Father to be present, virtually. He was able to testify and was able to be heard, to present evidence, and to cross-examine witnesses. Based on the foregoing, we find that the trial court did not abuse its discretion in denying Father's request for a continuance and electing to conduct the termination proceedings via a videoconferencing platform in conformity with Rule 241.

¶ 64        Furthermore, Father has failed to establish that he was prejudiced by the trial court's ruling. On appeal, Father argues that conducting the hearing via videoconference interfered with his ability to consult with his attorney "at all times," stripped him of his right to see what Truax was looking at during her testimony, and inhibited the court's ability to observe the witnesses and weigh their credibility. Father's contentions of prejudice are unfounded. The record indicates that Father conferred with his counsel in a breakout room four times during the hearing and that the court never denied a request from Father or his counsel to be placed in a breakout room for a consultation or to exchange notes.[2]

¶ 65        Father also asserts he was prejudiced because he could not see what Truax was looking at during her testimony. The dissent goes so far as to conclude that the video conference created a "specific challenge to the judge in that the witness appeared to be using notes while testifying." The record belies such an assumption. Indeed, the report of proceedings indicates that Father's counsel objected early in the fitness hearing because it appeared that Truax was looking down at something while testifying. Obviously, this nuance was not lost on Father's counsel as a result of the videoconference. Moreover, no one asked what it was that Truax seemed to be looking at. Upon making the objection, however the court instructed Truax not to refer to any notes unless requested to do so. This scenario occurs all of the time when a witness takes notes to the witness stand in anticipation of testimony, and it is not unusual for the trial court to similarly instruct a witness not to use notes. At no time did Father ask what Truax was allegedly referring to during her testimony, and he may not now claim that he is prejudiced by the omission of his own counsel. The fact that the trial court instructed the witness lends validity to the application of Rule 241, as the instruction by the court was an appropriate safeguard contemplated by the rule.

¶ 66        Finally, Father argues he was prejudiced because the trial court's ability to observe the witnesses and weigh their testimony was inhibited by the use of videoconferencing. Father's argument is nothing more than conjecture. There is simply no evidence that the videoconferencing platform interfered with or inhibited the trial court's ability to view the

---

[2]Notably, nothing in the record suggests that public health guidelines prevented Father from attending the hearings from the same remote location as his counsel.

- 13 -

witnesses, hear their testimony, and weigh the evidence. For the reasons stated, we find the trial court did not abuse its discretion in denying Father's motion to continue the proceedings and, alternatively, in denying his motion for an immediate in-person hearing.

¶ 67    Despite Father's forfeiture of his due process claim both in the trial court and on appeal, the dissent has elected to present a due process analysis and a Rule 241 analysis in Father's stead. Although we believe that we have already sufficiently addressed Father's properly preserved points on appeal, we feel the need to respond to the dissent's analysis and findings.

¶ 68    Written between the lines of the dissent is a dissatisfaction with the trial court's ruling on the petition to terminate Father's parental rights. The dissent's rationale suggests the belief that the State moved too fast, that the trial court should have given Father more time to prove himself and his sobriety, and that the trial court should have weighed Father's last-minute success more heavily. This court, however, cannot substitute its judgment for that of the trial court, and ultimately, the dissent does not suggest that the trial court's determinations as to unfitness and best interests were against the manifest weight of the evidence.

¶ 69    Other than the general tone that Father was "doing better" by the best interest hearing, the dissent in this case seems focused on three distinct issues: (1) that a parent has a due process right to an in-person hearing at both stages of a termination proceeding, (2) that the trial court misapplied Rule 241, and (3) that the remote appearance did not allow the trial court to sufficiently observe the demeanor of the parties and witnesses. We will address each in turn.

¶ 70    First, the dissent's finding of a due process right to demand an in-person hearing during termination proceedings is premised upon its belief that a parent's right to be "present" encompasses the right to be *physically* present in the courtroom during the hearing. The dissent further suggests that this right extends to requiring most, if not all, of the case participants to also appear in person.

¶ 71    The dissent, however, does not provide the basis for its belief that due process requires a physical presence at a hearing. Rather, the dissent cites section 1-5(1) of the Act (705 ILCS 405/1-5(1) (West 2020)), which provides that parents "have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also *** the right to be represented by counsel."[3] On its face, the statute does not indicate that the parent's right to be "present" at the hearing encompasses the right to demand an *in-person* hearing or that all case participants must share the same physical space.

¶ 72    The question of whether the statutory right to be present, in the civil context, requires an "in person" presence has not yet been decided by our supreme court. In the criminal context, however, we have some guidance that remote proceedings can satisfy the constitutional right to be present as it relates to due process. In *People v. Lindsey*, 201 Ill. 2d 45, 61-63 (2002), the Illinois Supreme Court rejected the argument that a defendant had to be physically present in the courtroom where certain statutory criminal provisions required that the pretrial proceeding take place in "open court." See 725 ILCS 5/113-1 (West 2020) (statute on arraignment procedures provides that a criminal defendant shall "be called into open court, informed of the

_____

[3]By statute, the Act, the Child Care Act of 1969 (225 ILCS 10/1 *et seq.* (West 2020)), the Interstate Compact on the Placement of Children Act (45 ILCS 150/0.01 *et seq.* (West 2020)), and the Intercountry Adoption Act of 2000 (42 U.S.C. § 14901 (2018)) are to be construed with the Adoption Act (750 ILCS 50/2.1 (West 2020)).

charge against him, and called upon to plead thereto" before he can be tried for the offense); 725 ILCS 5/103-6(i) (West 2020) (providing a defendant can waive his right to a jury trial by understandingly waiving the right "in open court"). In reaching the conclusion that remote appearances satisfied the "in court" requirement, the court relied upon section 106D-1(a) of the Code of Criminal Procedure of 1963, which provided that, " '[w]hen a defendant's personal appearance is not required by the Constitution of the United States or Illinois Constitution, the court may allow the defendant to *personally appear* at any pre-trial or post-trial proceeding by way of closed circuit television.' " (Emphasis added.) *Lindsey*, 201 Ill. 2d at 62-63 (quoting 725 ILCS 5/106D-1 (West 1998)). Construing the statutory provisions *in pari materia*, the court held that appearances via closed circuit television could satisfy the statutory requirement that the defendant be called into "open court" for purposes of arraignment and waiver of his right to a jury trial. *Lindsey*, 201 Ill. 2d at 63.

¶ 73    Unlike criminal proceedings, the termination of parental rights is governed by the Adoption Act, all matters attendant thereto are civil in nature, and the general rules of civil practice apply. *In re J.R.*, 342 Ill. App. 3d 310, 315 (2003); 750 ILCS 50/20 (West 2020).[4] Rule 241 allows persons to "testify or otherwise participate" in civil trials and evidentiary hearings by videoconference from remote locations and is located under Article II of the Illinois Supreme Court Rules.[5] While Rule 241 does not specifically state that remote participation is the same as the statutory right to be "present" at a hearing, such a finding is implicit in the Rule's provision allowing persons to "participate" remotely.[6] Indeed, the comments to the rule indicate that allowing the use of video technology "to conduct testimony under oath in civil trials increases accessibility to the courts, aids in the efficient administration of justice, avoids delays in trials, and *more efficiently* administers testimony for case participants who face an obstacle to appearing personally in court such as illness, disability, or distance from the courthouse." (Emphasis added.) Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020).

---

[4]"The provisions of the Civil Practice Law [(725 ILCS 5/2-101 *et seq.* (West 2020))] and all existing and future amendments of that Law and the Supreme Court Rules now or hereafter adopted in relation to that Law shall apply to all adoption proceedings except as otherwise specifically provided in this Act." 750 ILCS 50/20 (West 2020).

[5]"The court may, upon request or on its own order, for good cause shown and upon appropriate safeguards, allow a case participant to testify or otherwise participate in a civil trial or evidentiary hearing by video conferencing from a remote location." Ill. S. Ct. R. 241 (eff. May 22, 2020).

[6] Although not yet adopted, the Illinois Supreme Court's Rules Committee has proposed amendments to several rules on the use of remote appearances in civil proceedings. This includes a proposed amendment to Rule 2(b) defining the terms "in person or by attorney," "in person or through any attorney," "in person or by counsel," or "in person or by substitute counsel" as including "such individual appearing remotely, including by telephone or video conference under Rules 45 and 241 and any other rules governing remote appearance." Ill. S. Ct. Comm'n on Access to Justice, Proposal 21-01, https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/5c2c4fd1-9ca1-4d8d-9e70-1d9c037b0f78/Proposal%2021-01%20Amends%20Rules%202,%2021,%2088,%2090,%2091,%2093,%2099,%20100.6,%20100.7,%20100.8,%20100.10,%20113,%20203,%20206,%20207,%20209,%20217,%20218,%20237,%20277,%20551,%20901,%20905,%20and%20942%20Offered%20by%20Illinois%20Supreme%20Court%20Commission%20on%20Access%20to%20Justice.pdf. (last visited July 12, 2021) [https://perma.cc/JY3S-9935].

Based on the foregoing, we do not believe that section 1-5(1) of the Act provides a parent a statutory right to demand an in-person hearing during termination proceedings.

¶ 74    The dissent seems to suggest, nevertheless, that parents always have a constitutional due process right to be present in person, personally, in open court in a termination proceeding. Inasmuch as there is no case law that supports such a theory, the dissent likens a parent's procedural due process rights in termination proceedings to the "procedural protections accorded to criminal defendants." In criminal proceedings, however, the right to be physically present, even at a critical stage of the proceeding, is not absolute. In *Lindsey*, the Illinois Supreme Court rejected the defendant's contention that his appearance via closed circuit television for his arraignment and jury waiver violated his federal and state constitutional rights to be present at all critical stages of trial. *Lindsey*, 201 Ill. 2d at 54-60. Under the United States Constitution, a criminal defendant has a right to be physically present " 'at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.' " (Emphasis omitted.) *Lindsey*, 201 Ill. 2d at 57 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). As stated in *Lindsey*:

> " '[A criminal defendant] has a due process right "to be present in his own person whenever his presence has a relationship, reasonably substantial, to the fulness of his opportunity to defend against the charge." [Citation.] Although the Court has emphasized that this privilege of presence is not guaranteed "when presence would be useless, or the benefit but a shadow" [citation], due process clearly requires that a defendant be allowed to be present "to the extent a fair and just hearing would be thwarted by his absence" [citation].' " *Lindsey*, 201 Ill. 2d at 56-57 (quoting *Stincer*, 482 U.S. at 745).

¶ 75    As previously noted, the *Lindsey* court acknowledged that the use of a closed circuit television did not violate the defendant's right to be present "in open court" under the circumstances presented. *Lindsey*, 201 Ill. 2d at 57.

¶ 76    Article I, section 8, of the Illinois Constitution grants criminal defendants the right "to appear and defend in person and by counsel." Ill. Const. 1970, art. I, § 8.[7] Even this more express right, guaranteed by the Illinois Constitution, to be physically present at a hearing, is limited. Indeed, our Illinois Supreme Court has stated that " '[the right to be present] is a lesser right the observance of which is a means to securing the substantial rights of a defendant. Thus[,] a defendant is not denied a constitutional right every time he is not present during his trial, but only when his absence results in a denial of an underlying substantial right, in other words, a constitutional right,' " such as the right to confront witnesses, the right to present a defense, and the right to an impartial jury. *Lindsey*, 201 Ill. 2d at 57 (quoting *People v. Bean*, 137 Ill. 2d 65, 81 (1990)). As such, a criminal defendant's absence from a critical stage of the proceeding "will violate his constitutional rights only if the record demonstrates that defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right." *Lindsey*, 201 Ill. 2d at 57. Whether the fairness of the trial was affected by the defendant's absence from a portion of his trial is assessed in light of the entire record. *Lindsey*, 201 Ill. 2d at 57-58. Notably, while we again recognize that these are standards for criminal proceedings, we do so only to observe that the dissent appears to be providing

---

[7]There is no similar counterpart for civil proceedings or termination proceedings under the Adoption Act.

- 16 -

parents in civil termination proceedings greater constitutional procedural due process rights than those reserved for defendants in certain types of criminal proceedings. Moreover, as explained further herein, nothing in the record indicates Father was denied the right to confront witnesses, testify, or otherwise present his evidence. As such, we find that the hearing conducted via videoconference did not deny Father his constitutional due process right to be "present" at the hearing.

¶ 77    The dissent next concludes that the trial court misapplied Rule 241. On this point, the dissent asserts that (1) the express language of Rule 241 does not permit the trial court to hold the entire termination hearing remotely without the consent of the parents, (2) there was no "good cause" shown that would permit remote participation in this case, and (3) the trial court did not balance the competing factors before denying Father's motion to continue and request for an in-person hearing.

¶ 78    The dissent contends that the express language of Rule 241 only permits a court to "allow" a case participant to participate remotely, but that it does not grant the trial court the authority to "*require[ ]* case participants—including parents whose fundamental right to a continued relationship with their children was at stake—to participate from remote locations despite their expressed preference for an in-person hearing and [a] formal objection to holding a remote hearing." (Emphasis in original.) *Infra* ¶ 122. Thus, the argument contends that the rule is permissive and that the trial court's decision can be preempted where a party objects.

¶ 79    There is nothing in the language of the rule that requires a party to consent or otherwise approve of the trial court's decision to conduct a hearing remotely. Therefore, we find the dissent's reading of the rule to be strained. Rule 241 specifically permits the court to allow remote participation "upon request or *on its own order*." (Emphasis added.) Ill. S. Ct. R. 241 (eff. May 22, 2020). Any argument that Rule 241 requires the consent of a party, or other case participant, is simply not supported by the plain reading of the rule, itself.

¶ 80    The dissent also concludes that "good cause" did not exist in this case where limited court operations were in place due to a nationwide pandemic. Again, the plain language of the rule grants the court the authority to exercise its judgment that good cause exists and order the cause to proceed remotely. The rule also requires that the court adopt "appropriate safeguards" to protect the rights of the litigants and witnesses. Ill. S. Ct. R. 241 (eff. May 22, 2020). There is a paucity of information in the record regarding when and why the decision was made to hold the termination hearings via videoconference. The record does indicate that the attorneys and the parties became aware that the termination hearings were going to be conducted via videoconference prior to the hearing. The decision to conduct the hearings remotely was made because the Madison County courts were not conducting in-person hearings, except in emergency situations, due to the ongoing coronavirus pandemic. Other than these few facts, the dissent goes to great lengths to fill in the gaps in the record with assumptions that are convenient to its ultimate conclusion. For example, without any further factual information as to the conditions which prompted the trial court to reset the hearing, the dissent concludes that court operations were not sufficiently limited to constitute "good cause" under the rule because (1) the trial court had conducted in-person hearings during the pandemic months earlier and (2) the chief judge of the Third Judicial Circuit entered administrative orders permitting "essential court proceedings" to be conducted in person.

¶ 81    The dissent's finding that the trial court could have provided the parents with an in-person hearing with little or no delay is nothing more than unsupported speculation. The reality is that

court operations in Madison County were limited due to public health concerns caused by the ongoing pandemic, and there is simply no evidence in the record suggesting that an opportunity for an in-person hearing was readily available under the current conditions in the community, the court, or for all of the case participants. As already discussed in the main portion of this opinion, the pandemic and the health threat posed by it provided "good cause" for the trial court to conduct the hearing via videoconference.

¶ 82   In further support of the dissent's argument that the court misapplied Rule 241, the dissent suggests that the trial court did not "take into consideration and balance any due process concerns, *** the type of case, *** and any other issues of fairness" in denying Father's request for a continuance and proceeding with the hearing via videoconference. (Internal quotation marks omitted.) *Infra* ¶ 125. Initially, we must reiterate that Father *did not raise* his alleged due process right to an in-person hearing when requesting a continuance before trial. Instead, Father only asserted that he did not consent to the videoconference hearing because he had a "preference" for an in-person hearing "[g]iven the difference in cross examining the witnesses" and the ability to "see the witness, *** see what the witness is doing, [and] who the witness is with."

¶ 83   The dissent's suggestion that the trial court did not balance the necessary factors is belied by the record. Prior to rendering its decision to proceed remotely, the court heard the arguments from the parents and the State regarding concerns about viewing the witnesses, the possibility of outside influences upon the witnesses, the type of the proceeding, the competing interests at stake, and the parents' right to counsel. In denying Father's motion to continue, the court specifically indicated that it did not believe the parents' constitutionally protected rights would be infringed by moving forward. Thus, pursuant to Rule 241, the court considered what was necessary to protect the due process rights of the litigants and determined that a hearing via videoconference could be safely conducted.

¶ 84   Had Father desired a more robust argument and analysis of his request to continue the hearing, he should have filed a written motion objecting to the videoconference hearing and requesting a continuance. That motion could have more clearly described his alleged claim of a due process right, a violation of that right, and may have clarified when the court could have conducted an in-person hearing. The record demonstrates that Father and his counsel knew, prior to the hearing, that the court was considering conducting the termination hearings via videoconference. Instead of filing a written motion objecting to the procedure, Father elected to wait until the start of the hearing and made his objections and motion to continue orally.

¶ 85   The dissent glosses over the fact that Father knew the hearing may be conducted remotely. Instead, the dissent indicates that Father was "caught off-guard by the State's sudden objection" at the hearing because Father had advised the State prior to the hearing that he intended to object to the Zoom hearing and believed the State would agree to the continuance. *Infra* ¶ 113. There is a real distinction between what facts are contained in the record at trial versus those set out in Father's posttrial motion. We believe it is important to observe that the overwhelming majority of "facts" presented by the dissent on this issue are derived from Father's posttrial motion to reconsider. These "facts" are unsupported by any evidence in the record, were not raised as a basis for granting the continuance at the hearing or on appeal, and are nothing more than unvetted allegations. The dissent, however, argues that we should take as true Father's allegations in his posttrial motion wherein allegations were made that Father, or his counsel, notified the state's attorney that Father would be seeking a continuance of the

hearing. This information was certainly not made available to the trial court when it was considering Father's request for a continuance, and the trial court denied Father's posttrial motion before the State could respond. Therefore, the question arises as to why Father remained silent about this alleged set of circumstances when asking the trial judge to continue the case. Ultimately, the failure to file a written motion setting forth Father's objections and arguments supporting the contention that proceeding with the hearing as scheduled would result in a deprivation of Father's constitutional rights falls squarely on Father's counsel. Simply put, the record belies the dissent's assertions that the trial court did not balance the various pros and cons of proceeding remotely before it denied Father's motion for a continuance.

¶ 86      Finally, the dissent argues that the use of a videoconference platform denied the trial court the opportunity to observe Father's demeanor and somehow interfered with the trial court's ability to judge the credibility of the witnesses. Nothing in the record supports this argument. Despite this conclusion by the dissent, Father has made no allegation that conducting the hearing via videoconference instead of in person denied him a substantial constitutional right to confront witnesses against him. Nowhere in the record has Father asserted that the videoconference hearing adversely affected the fairness of the proceeding or affected Father's opportunity to defend against the petition. And we simply cannot fill in the void for Father when he has failed to do so.

¶ 87      Even if we were to accept the dissent's argument, the facts of this case render it meritless. For example, the dissent believes that Father's reaction to Truax's testimony would have provided the trial court with "subtle clues" as to the veracity of the witness's testimony. The dissent believes this was vitally important in this case because only 10 months elapsed between the adjudication of neglect and the filing of the petition to terminate parental rights and that these clues were necessary in determining whether Father's efforts and progress during this time were "reasonable." Make no mistake, the uncontested evidence at the unfitness hearing was that Father made very little effort, and absolutely no progress, on any of his service plan tasks during the nine months at issue, despite persistent efforts to get Father to engage. And the dissent provides no insight into how viewing Father, in person, as opposed to over a live video monitor, would have given the trial court a better vantage to view Father's "reaction" to Truax's uncontested testimony. After all, Father did not challenge the testimony of Truax indicating that Father failed to engage in services that would have, or should have, altered the trial court's finding of unfitness or transformed Father's lack of effort and progress into something "reasonable." Father did not testify in response to the evidence offered by Truax during the fitness hearing. Thus, it is mere conjecture that Father had any relevant response to the testimony given by Truax that was "missed" by the trial court.

¶ 88      The same result is true for the "best interests" determination. Truax and Father agreed as to the most salient facts weighing in Father's favor at the best interests hearing: (1) Father had very recently completed in-patient drug treatment, (2) Father and the children were bonded to each and loved each other, (3) the children were excited for visits, and the interaction between Father and the children was positive, and (4) P.S. wished to continue visits with her parents even if she was adopted. The major point of contention in this case was whether Father was willing and able to overcome his own issues so that he could meet the many needs of his children in the future. Again, the uncontested evidence at the hearing was that, for the overwhelming majority of the case, Father was either unwilling or unable to do this, in that he

made little or no effort to seek treatment for his persistent substance abuse, mental health, and domestic violence issues.

¶ 89 Furthermore, while the dissent insinuates that the timeline in the case was unfairly compressed, the full record demonstrates otherwise. While only relevant to the "best interests" determination, the evidence is clear that the conditions that brought the children into care were present no later than February 1, 2019, at the time of A.S.'s birth almost two years earlier. At that time, DCFS initiated an investigation and intact services. Father did not cooperate with those services, notably denying any substance abuse issues. Father's November 2020 completion of in-patient drug treatment is admirable, and certainly everyone involved hopes that he maintains his sobriety. This success, however, was only achieved in the weeks prior to the termination hearing, and its staying power was untested. Father's ability to maintain sobriety was untested because he chose not to fully engage in substance abuse treatment services earlier, despite the fact that his children were in State care.

¶ 90 Based on the foregoing, we do not believe that Father had either a statutory or constitutional due process right to an in-person hearing during the termination proceedings. Furthermore, we do not believe that the trial court misapplied Rule 241 in conducting the termination proceedings via a videoconferencing platform or that the videoconferencing platform limited the trial court's ability to observe the case participants and interfered with its ability to judge the credibility of the witnesses.

¶ 91                                                  CONCLUSION

¶ 92 For all of the foregoing reasons, we affirm the judgment of the circuit court of Madison County.

¶ 93 Affirmed.

¶ 94 JUSTICE WHARTON, dissenting:

¶ 95 Due to the importance of the rights at stake in this case and the permanence of the order severing the parent-child relationship—a State action that represents a parental death sentence—I cannot agree with the majority that due process never requires an in-person hearing. Furthermore, I cannot agree with the majority that the hearing in this case comported with the requirements of due process. I also believe that by holding the entire termination hearing remotely without the consent of the parents and without balancing due process concerns and "other issues of fairness," the trial court read Rule 241 more broadly than was intended. For these reasons, I respectfully dissent.

¶ 96 The United States Supreme Court has long recognized "the primacy of the parent-child relationship" (*M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972), and *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923))). Thus, as the majority explained, parents enjoy a fundamental liberty interest in maintaining their relationships with their children. See *D.R.*, 307 Ill. App. 3d at 482. An order terminating parental rights permanently severs that relationship. "Few forms of state action are both so severe and so irreversible." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982).

¶ 97 It is important to note at the outset that, because of these concerns, the Illinois Supreme Court has explicitly held that proceedings involving the termination of parental rights must

comport with the requirements of due process. *In re J.J.*, 201 Ill. 2d 236, 243 (2002). Thus, the fact that proceedings are deemed to be civil in nature does not completely answer the question before us. See *M.L.B.*, 519 U.S. at 128. Parental termination cases are quite distinguishable "from mine run civil actions, even from other domestic relations matters such as divorce, paternity, and child custody." *Id.* at 127. Indeed, the United States Supreme Court has likened a respondent "endeavoring to defend against the State's destruction of her family bonds" to a criminal defendant because both "seek[ ] to be spared from the State's devastatingly adverse action." *Id.* at 125. "[T]ermination decrees 'wor[k] a unique kind of deprivation.' " *Id.* at 127 (quoting *Lassiter v. Department of Social Services*, 452 U.S. 18, 27 (1981)).

¶ 98    As such, parents enjoy many of the procedural protections accorded to criminal defendants. See *id*. at 124. For example, parents in termination proceedings in Illinois have the right to appointed counsel, the right to present evidence, the right to cross-examine witnesses against them, and—most significantly for purposes of this appeal—the right to be present at hearings. 705 ILCS 405/1-5(1) (West 2018).

¶ 99    At issue is the State's authority to permanently sever the intimate relationship between a parent and his child through a totally remote Zoom hearing. In determining whether due process liberty interests are implicated by the State's action, we are cautioned to look not only at the *weight* of an individual's interest but to consider the *nature* of the interest at stake. See *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (citing *Fuentes v. Shevin*, 407 U.S. 67 (1972)). The United States Supreme Court has reiterated that "a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' " *Lassiter*, 452 U.S. at 27 (quoting *Stanley*, 405 U.S. at 651). More definitively, the United States Supreme Court has concluded that " 'the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment.' " *M.L.B.*, 519 U.S. at 119 (quoting *Santosky*, 455 U.S. at 774 (Rehnquist, J., dissenting, joined by Burger, C.J., and White and O'Connor, JJ.)).

¶ 100    Although a parent has a fundamental interest in the relationship with his child and a statutory right to be present at hearings, the right to be present is not absolute. See *In re J.M.*, 2020 IL App (2d) 190806, ¶ 42. However, due to the nature of the rights at stake, I believe that terminating a parent's rights, under the specific facts and circumstances of this case, without allowing the parent to be present in person at the hearing, raises due process concerns. See, *e.g.*, *id.* ¶ 37; *S.W.*, 2015 IL App (3d) 140981, ¶¶ 43-44; *In re C.J.*, 272 Ill. App. 3d 461, 465-66 (1995). The Illinois Appellate Court, confronting these due process concerns, has utilized the three factors set forth by the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine whether the requirements of due process were satisfied under the specific facts and circumstances of the cases before them. See, *e.g.*, *J.M.*, 2020 IL App (2d) 190806, ¶¶ 41-49; *In re M.R.*, 316 Ill. App. 3d 399, 402-03 (2000); *C.J.*, 272 Ill. App. 3d at 465-66.[8]

---

[8] I note that the Fourth District found due process analysis inapplicable in a case involving a request for a continuance to allow a parent to attend her termination hearing. *In re S.B.*, 2015 IL App (4th) 150260, ¶ 21. The court reasoned that, in other civil proceedings, a ruling on a motion for a continuance is ordinarily a matter of judicial discretion that does not involve questions of due process. *Id.* (citing

¶ 101    The *Mathews* factors are (1) the nature of the private interest at stake; (2) the risk of erroneous deprivation and the value of additional safeguards; and (3) the State interest involved, including the burdens that additional safeguards would impose. *Mathews*, 424 U.S. at 334-35. In applying these factors, we must keep in mind that due process is "a flexible concept that affords procedural protections as required by specific situations." *J.M.*, 2020 IL App (2d) 190806, ¶ 40 (citing *In re J.S.*, 2018 IL App (2d) 180001, ¶ 18, citing *Mathews*, 424 U.S. at 334). Applying these three factors to the case before us, I believe that due process required that Father be permitted to be present at the termination hearing.

¶ 102    The first *Mathews* factor is the private interest involved. As already emphasized in both the majority opinion and my dissent, this case involves the termination of one of the most fundamental rights protected under our constitution. This factor weighs heavily in favor of Father's argument. See *id.* ¶ 43; *M.R.*, 316 Ill. App. 3d at 402; *C.J.*, 272 Ill. App. 3d at 465.

¶ 103    The second *Mathews* factor is the risk of an erroneous deprivation of the right involved and the value of providing additional safeguards. Here, I recognize that Father was represented by counsel and that he was permitted to participate in the hearing remotely and to present evidence, including his own testimony. These features do mitigate the risk of an erroneous deprivation to a great extent. See *J.M.*, 2020 IL App (2d) 190806, ¶ 47; *M.R.*, 316 Ill. App. 3d at 402-03. However, as I will explain in more detail, I do not believe they eliminate the risk.

¶ 104    In crafting Rule 241, our supreme court has explicitly recognized the importance of live testimony. See Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020). The ability to observe both witnesses and parties in person can be crucial and should not be understated. A party's reaction to a witness's testimony can give subtle clues as to the veracity of the witness's testimony. The demeanor of a parent during a hearing can also give subtle clues about his temperament and his attitude towards his children. Indeed, the trial court's opportunity to observe first-hand the demeanor of the parties is one of the reasons we give such great deference to its decisions in matters involving the welfare of children. See *In re Jay. H.*, 395 Ill. App. 3d 1063, 1070 (2009).

¶ 105    Although video conferencing platforms like Zoom do not eliminate a judge's opportunity to observe a parent's demeanor throughout the hearing, they do impose limitations. See *People v. Stroud*, 208 Ill. 2d 398, 407 (2004) (explaining that in a video appearance, " 'crucial aspects of defendant's physical presence may be lost or misinterpreted, such as the participant's demeanor, facial expressions, and vocal inflections' " (quoting *People v. Guttendorf*, 309 Ill. App. 3d 1044, 1046-47 (2000))). A judge can only see what takes place within the video frame, and it is harder to watch parties' real time reactions to testimony when the parties and the

*Benton v. Marr*, 364 Ill. 628, 630 (1936)). However, the Fourth District went on to hold that the trial court abused its discretion because its denial of the mother's motion to continue was unjust under the circumstances of the case. Relevant circumstances included the fact that the mother's parental rights were at stake, the fact that she was delayed in reaching the court due to circumstances beyond her control, and the fact that she was seeking a short delay. *Id.* ¶ 23. These are the very factors involved in my due process analysis in this case. I also note that in *S.W.* the Third District similarly applied an abuse-of-discretion standard to a court's decision to deny a mother's requests for continuances. See *S.W.*, 2015 IL App (3d) 140981, ¶¶ 32-38. However, the court also went on to consider the mother's alternative argument that the trial court violated her right to due process by denying her requests for continuances and by holding the best interest portion of the termination process in her absence. *Id.* ¶¶ 41-44.

witnesses appear in separate boxes. In this case, the Zoom hearing presented a specific challenge to the judge in that a witness appeared to be using notes while testifying and Father's attorney objected, stating that "[e]very time the witness answers she appears to be looking off-camera down at something, so I don't believe she's testifying from her memory or, you know, from her personal knowledge." The judge was unable to determine whether the witness was testifying from notes due to the visibility constraints resulting from the video frame. The judge communicated to the witness: "I don't know if you're reading anything, but don't refer to any notes or anything unless specifically requested to, okay?"

¶ 106    In this case, those subtle clues were particularly important. The question before the trial court was whether Father's efforts and progress were reasonable. Unlike many cases involving the termination of parental rights, only 10 months elapsed between the adjudication of neglect and the date on which the State filed its motion to terminate. During this period, Father took the important step of seeking in-patient treatment for his addiction. At the time the petition to terminate was filed, he was on a waiting list for a program. By the time the termination hearing was held, he had successfully completed that program. Although Father did not complete the program until after the period identified in the petition to terminate, a trial court may consider a parent's efforts during the entire period following the adjudication of neglect. *In re E.S.*, 246 Ill. App. 3d 330, 338 (1993).

¶ 107    In reviewing the entire period after the minors were adjudicated neglected, Father also secured employment as a forklift operator and attended all scheduled visits with the children. Furthermore, the DCFS caseworker testified that Father was cooperative and that he had very positive interactions with the children during his visits. Despite the obvious impact of the COVID-19 pandemic, Father took several important steps toward correcting the conditions that resulted in the removal of the children from the home.

¶ 108    In determining whether to take the extraordinary step of terminating Father's parental rights, the trial court had to consider whether Father was likely to continue to make progress so that the children could be returned to his care. See *In re L.L.S.*, 218 Ill. App. 3d 444, 459 (1991) (explaining that "reasonable progress requires measurable or demonstrable movement toward the goal of reunification" (internal quotation marks omitted)). A better opportunity to observe Father's temperament could have helped inform the court's decision. For these reasons, I believe that the risk of erroneous deprivation weighs at least slightly in favor of finding that due process required an in-person hearing.

¶ 109    The final *Mathews* factor is the State's interest. As Illinois courts have often recognized, the State has an interest in providing permanence to the children involved in these proceedings. See, *e.g.*, *J.M.*, 2020 IL App (2d) 190806, ¶ 48; *M.R.*, 316 Ill. App. 3d at 403; see *C.J.*, 272 Ill. App. 3d at 466. Pertinent here, the State also has an interest in limiting the spread of COVID-19. While both of these State interests are important, I do not believe forcing Father to forgo his right to an in-person hearing was necessary to protect either of these State interests.

¶ 110    I first address the State's interest in providing permanence to the children involved in this case. The State has an interest in avoiding undue delay in juvenile cases because "*serious delay*** can cause grave harm to the minors.*" (Emphasis added.) *S.W.*, 2015 IL App (3d) 140981, ¶ 31. Here, however, the State filed a petition to terminate parental rights only 10 months after the court entered an adjudicatory order, and the matter came for a termination hearing less than 4 months later. This case, therefore, does not involve the type of "serious delay" that often occurs. See, *e.g.*, *id.* ¶¶ 6, 14, 22-24 (where the petition to terminate was filed when the case

involving the older child had been pending for nearly four years and the case involving the younger child had been pending for nearly two years, and the termination hearing took place one year later due to continuances requested by the mother); *M.R.*, 316 Ill. App. 3d at 400, 403 (noting that the June 1998 termination hearing "had previously been continued and set for trial at least once since 1996").

¶ 111 Moreover, providing Father with an in-person hearing would not necessarily have required any substantial delay. See *J.M.*, 2020 IL App (2d) 190806, ¶ 49 (considering the "lengthy delay in the proceedings" that would have been necessary to arrange for the incarcerated father to be transported from a Wisconsin prison to Illinois for a hearing); *M.R.*, 316 Ill. App. 3d at 403 (noting that the mother's release date from a psychiatric hospital was unknown); *C.J.*, 272 Ill. App. 3d at 466 (finding that the State's interest in permanency for the children "would not have been unduly burdened" where "less time-consuming" alternatives to waiting for the incarcerated mother's release date were available).

¶ 112 It is also worth noting that the court could have provided the parents with an in-person hearing with *no* additional delay. The record in this case reveals that the hearing was originally set to take place in person on October 1, 2020. On that date, the State's attorney, Mother's attorney, and the GAL appeared in person, and the trial court entered its order granting the motion to continue that all parties requested. The order reset the termination hearing for November 24, 2020, without any indication that the hearing would not be in person. The parties were ordered "to appear" on November 24, 2020.[9] The court, therefore, could have held the hearing in person as scheduled. Alternatively, the court could have addressed the possibility of holding a virtual hearing instead at a status conference rather than making that change without consulting with the respondent parents.

¶ 113 I also note that Father and his attorney had always intended to object to the Zoom hearing. Father's attorney communicated this intent to the Madison County State's Attorney assigned to this case. In Father's motion to reconsider filed on December 23, 2020, his attorney verified that he provided advance notice to the state's attorney that he would be requesting the continuance. The state's attorney did not state any objection to this procedural plan, and Father's attorney believed that the State had no objection to his request. So, on November 24, 2020, at the beginning of the Zoom hearing, Father's attorney made his oral motion to continue the case, noting that the case had originally been scheduled for an in-person hearing and that his client would not consent to the Zoom hearing. The trial court then asked the state's attorney for her response. She stated that "the State is fully prepared to move forward." Father's attorney was caught off-guard by the State's sudden objection as he believed the State would agree to the continuance. The court immediately denied the motion. Father's attorney then asked to convert the hearing on that date to an in-person hearing, stating: "If it's such an emergency that it needs to happen today, then I think we can all come to court and have it in person today." The court denied the second motion without further comment and directed the State to proceed with its case. Although the majority construes the statements made by Father's attorney in the motion to reconsider to be "nothing more than unvetted allegations," I find that the pleading

---

[9]I also note that although the court made no express statement to this effect, the COVID-19 pandemic was presumably utilized as the foundation for holding the termination hearing remotely by Zoom. However, this court and judge held in-person hearings earlier in this case, including a hearing that took place on October 1, 2020, just weeks before hearing at issue.

- 24 -

was signed by the attorney in compliance with Illinois Supreme Court Rule 137(a) (eff. Jan. 1, 2018). As Rule 137(a) provides, "[t]he signature of an attorney *** constitutes a certificate by him that he has read the *** motion *** [and] that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law." *Id.*

¶ 114    Under these circumstances—where the trial court had held in-person hearings in this case throughout the COVID-19 pandemic, including an in-person hearing just weeks before the hearing at issue, and where there was a misunderstanding of the State's intentions with respect to Father's planned request for a continuance to accommodate an in-person hearing—I do not believe the State's interest in providing the children with permanency as early as possible outweighed Father's interest in having an in-person hearing.

¶ 115    I reach a similar conclusion with respect to the State's interest in preventing the spread of COVID-19. As I will explain more fully next, Madison County was holding in-person hearings in "essential cases" at the time the termination hearing in this case took place, including hearings in this type of case. Considering the totality of the circumstances of this case, I cannot find that the State's legitimate interests required an entirely virtual hearing at all, much less that these interests outweighed Father's interests. Weighing all three *Mathews* factors, I find that holding a fully virtual hearing over Father's objections violated his right to due process.

¶ 116    Before turning my attention to the question of whether the court complied with the requirements of Rule 241, I wish to address the majority's discussion of *Lindsey* and its suggestion that I "appear[ ] to be providing parents in civil termination proceedings greater constitutional procedural due process rights than those reserved for [criminal] defendants." *Supra* ¶ 76. With all due respect, I believe this statement mischaracterizes both my dissent and the holding of *Lindsey*.

¶ 117    The majority states that the supreme court's holding in *Lindsey* provides us with "some guidance that remote proceedings can satisfy the constitutional right to be present as it relates to due process." *Supra* ¶ 72. Although I believe that the Illinois cases I have discussed, which utilized the *Mathews* factors to address the requirements of due process in the context of parental termination hearings, provide the appropriate analytical framework, I agree that *Lindsey* can provide additional guidance.

¶ 118    In *Lindsey*, a criminal defendant appeared remotely at several pretrial hearings, including his arraignment and a hearing at which he waived his right to a jury trial. *Lindsey*, 201 Ill. 2d at 47-48. At both hearings, the defendant appeared by closed-circuit television from the jail. *Id.* The supreme court found that both hearings were "critical stages" of the proceedings against the defendant. *Id.* The supreme court explained, however, that the constitutional right to be present at critical stages of criminal proceedings is not absolute. *Id.* at 56. The court held that a defendant's remote appearance violates his right to be present at a critical stage only if he can show that his "physical absence from the proceedings caused the proceedings to be unfair or that his physical absence from the proceedings resulted in the denial of an underlying constitutional right." *Id.* at 60.

¶ 119    In finding that the defendant's remote participation did not violate his rights under the circumstances of the case before it, the supreme court highlighted two significant factors. First, the court noted that although the "defendant was not physically present in the courtroom for his arraignment and jury waiver, neither was he entirely absent from these proceedings." *Id.* at 58. I recognize that the same is true in this case. The supreme court also found it significant,

- 25 -

however, that the defendant's "right to confront witnesses was not implicated because there were no witnesses to confront at the proceedings." *Id.* at 59. Unlike *Lindsey*, the hearing at issue in this case did involve witness testimony.

¶ 120    The most significant difference between this case and *Lindsey* is the stage of proceedings at issue. This case involves a final determination of parental unfitness, not a preliminary matter. The Illinois Supreme Court drew precisely that distinction in *People v. Stroud*. There, a criminal defendant participated in his guilty plea hearing by closed-circuit television. *Stroud*, 208 Ill. 2d at 400. In finding that his constitutional right to be present at a critical stage was violated by this procedure (*id.*), the court specifically distinguished the case before it from *Lindsey* on the basis that *Lindsey* involved an arraignment and a waiver of the right to a jury trial rather than a plea hearing (*id.* at 406). The supreme court explained, "The number and gravity of rights at stake at a guilty plea hearing is greater than when a defendant intends to plead not guilty at arraignment." *Id.* In significant part, this is because a guilty plea hearing, unlike an arraignment or jury trial waiver, directly results in a judgment of conviction. *Id.* (citing *Guttendorf*, 309 Ill. App. 3d at 1047, citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)). Similarly, the hearing at issue in this case resulted in the permanent severance of Father's parental rights. Thus, to the extent we can look to criminal cases for guidance, this case is more akin to *Stroud* than it is to *Lindsey*.

¶ 121    The majority asserts that I want to give parents in termination hearings more rights than criminal defendants enjoy. Nothing could be further from the truth. Both parents in termination cases and criminal defendants are entitled to due process. In both contexts, the requirements of due process depend upon the specific facts and circumstances involved. For the reasons I have discussed, I find that under the circumstances of this case, the requirements of due process were not satisfied.

¶ 122    I also do not believe the express terms of Rule 241 allow courts to hold an entirely virtual hearing over the objection of a party under the circumstances of this case. The rule provides that a court may "*allow* a case participant to testify or otherwise participate in a civil trial or evidentiary hearing by video conferencing from a remote location." (Emphasis added.) Ill. S. Ct. R. 241 (eff. May 22, 2020). Here, the court *required* case participants—including parents whose fundamental right to a continued relationship with their children was at stake—to participate from remote locations despite their expressed preference for an in-person hearing and Father's formal objection to holding a remote hearing. There is a significant difference between allowing something and requiring it. Further, the rule explicitly requires a showing of good cause. *Id.* Although limited court operations can constitute "good cause" (see Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020)), Madison County was holding live hearings in "essential cases" at the time of the termination hearing in this case.

¶ 123    Early in the pandemic, on March 20, 2020, the chief judge of the Third Judicial Circuit, which includes Madison County, entered Administrative Order 2020-M-9, which stated that "only essential court matters and proceedings shall continue to be heard in the Third Judicial Circuit in order to protect the health and safety of court patrons, staff, judges[,] and the general public." Third Judicial Cir. Ct. Adm. Order 2020-M-9 (Mar. 20, 2020), https://files1.revize. com/revize/madisoncounty/document_center/CircuitClerk/Administrative%20Oder%202020M 9.pdf [https://perma.cc/2MRG-FN3T]. The chief judge ordered that all non-essential court matters and proceedings would either be continued or conducted remotely. *Id.* "Essential court proceedings" included:

"1. All matters with individuals in custody, including bond hearings;

2. Criminal trials with speedy trial demands and those in custody;

3. Summary suspension hearings, absent an agreed continuance;

4. Emergency and Plenary Petitions for Protective Orders (including, but not limited to, Orders of Protection, Stalking, No Contact, Civil No Contact and Firearms Surrender Order);

5. Detention hearings for detained juveniles;

6. *Shelter Care and other essential hearings for juveniles who may have been abused or neglected*;

7. Mental Health hearings for involuntary commitment or treatment;

8. Emergency hearings in family matters scheduled only with the approval of the Court; [and]

9. Any other emergency hearing scheduled and approved by the court." (Emphasis added.) *Id.*

The chief judge also entered an order effective November 16, 2020—just eight days before the termination hearing in this case—restating its intent to hold in-person proceedings in "essential court matters." Third Judicial Circuit Ct. Adm. Order 2020-M-29 (Nov. 13, 2020), https://files1.revize.com/revize/madisoncounty/document_center/CircuitClerk/Administrative%20Order%202020-M-29%20COVID-19%20Resurgence%20Response.pdf) [https://perma.cc/8JJ2-5UUW]. Again, the order specifically included "Shelter Care and other essential hearings for juveniles who may have been abused or neglected." *Id.*

¶ 124    Here, the Third Judicial Circuit entered orders providing express COVID-19 procedures and categories for in-person court proceedings. While I recognize that these administrative orders did not mandate in-person hearings, the orders also did not prohibit the court from holding in-person hearings. Considering the timing and subject matter of these administrative orders, Father's attorney seemingly misspoke in communicating his oral motion for a continuance, when he stated that Madison County was only holding in-person hearings in emergency situations. A termination hearing assuredly constituted an "essential" court proceeding, as detailed in the Madison County orders. Therefore, I believe there was no "good cause" shown based on limited court operations to require a remote hearing.

¶ 125    In addition, the committee comments to Rule 241 direct courts to "take into consideration and balance any due process concerns, *** the type of case, *** and any other issues of fairness." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020). Here, no such balancing occurred. Instead, the court stated only, "Given the fact that it's a bench trial, and more importantly, I don't believe permanency for the children should be delayed, I don't believe the parents' constitutionally protected rights would be infringed by going forward with the Zoom hearing." Of note, the trial court did not reference the COVID-19 pandemic as necessitating the change from in person to remote presence. I agree with the majority's statement that the record contains a "paucity of information" about when and why this court ordered the hearing to be held remotely. However, the absence of an express statement of the court's rationale for holding this critical hearing remotely should be weighed against finding "good cause" shown. I do not believe Rule 241 was intended to allow courts to *require* litigants to appear remotely under the circumstances of this case with no showing that the hearing could

not have taken place in person and with no indication that the court weighed any of the relevant concerns or considered less drastic alternatives, such as observing social distancing.

¶ 126 Finally, I note that although Father argued that the court violated his right to due process and emphasized the fact that the court opted to hold the hearing by Zoom due to circumstances beyond Father's control, he did not specifically address the *Mathews* factors or the interplay between those factors and Rule 241. However, even assuming Father forfeited his claim by presenting it in this manner, forfeiture is a limitation on the parties, not on this court. *People v. Sophanavong*, 2020 IL 124337, ¶ 21. I find that it is appropriate to give full consideration to the due process concerns raised by Father in this case in order to reach a just result. See *S.B.*, 2015 IL App (4th) 150260, ¶ 23. Addressing the issue would also provide guidance to courts in future cases. See *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65.

¶ 127 Rule 241 is intended to allow the use of relatively new technology to increase access to the courts. See Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020). In many cases, allowing a party or witness to participate remotely by video will have this intended effect. For instance, a disabled parent or a parent with a limited income who struggles to find transportation may benefit from being allowed to participate remotely. In cases where a caseworker has moved away, allowing a caseworker who is familiar with the family to testify remotely may be more beneficial than relying on the testimony of a different caseworker who must base his or her testimony on a review of the case file. There also may be circumstances where it truly is impossible to hold an in-person hearing without a substantial delay, such as during the early days of the pandemic before courts and health departments had established procedures for dealing with COVID-19.

¶ 128 However, given the importance of in-person testimony (see *id.*), courts must carefully decide on a case-by-case basis whether doing so will instead infringe on a party's due process rights, particularly in cases like this one that involve fundamental rights. Based on the record in this case, I do not believe the court weighed all the relevant considerations before holding a remote hearing over the objection of Father. Moreover, based on a careful consideration of the totality of the relevant facts and circumstances, I do not believe the hearing complied with the requirements of due process. Contrary to the majority's telepathic speculation, in reaching this conclusion, I am not commenting on the issue of Father's fitness as a parent. By virtue of the permanency and seriousness of this case, providing Father with a fair hearing necessarily precedes the issue of the determination of his fitness. For these reasons, I would reverse and remand for a new termination hearing.