2021 IL App (1st) 210740-U
Order filed October 21, 2021

FIRST DISTRICT
FOURTH DIVISION

No. 1-21-0740

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* T.J., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | No. 18 JA 466 |
| | ) | |
| Petitioner-Appellee, | ) | Honorable |
| | ) | Bernard J. Sarley, |
| v. | ) | Judge, presiding. |
| | ) | |
| N.R. | ) | |
| | ) | |
| Respondent-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| C.J., | ) | |
| | ) | |
| Respondent-Appellee). | ) | |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Reyes and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's judgment is affirmed, where conducting termination of parental rights hearings by video conference did not violate the father's due process and statutory rights to be present at the hearings, and the court did not abuse its discretion in denying the father's motion for continuance of the hearings.

¶ 2    Defendant-appellant, N.R., appeals from orders finding he was unable to care for his minor

son, T.J., and terminating his parental rights. T.J.'s mother, C.J. (the mother), is not a party to this

appeal. The circuit court proceedings at issue occurred during the global COVID-19 pandemic, when in-person court operations were limited for health reasons and subject to mandates issued by the Governor of the State of Illinois and corresponding orders of the Illinois Supreme Court and the Circuit Court of Cook County. The critical hearings were conducted by video conference, using an internet-based video-conference platform, Zoom Video Communications (Zoom). N.R. argues that conducting the termination hearings by video conference denied him of his right to due process and his statutory right to be present at the hearings. N.R. further maintains that the circuit court abused its discretion in denying his request that the termination of parental rights hearings be continued until in-person proceedings could be held. For the following reasons, we affirm.

¶ 3    On May 2, 2018, T.J. (born June 1, 2017) was admitted to Stroger Hospital (Stroger) and found to be significantly underweight. Prior to this hospitalization, T.J. had missed checkups, immunizations, and checkups for an irregular heartbeat. T.J. had been living in the home of his maternal great-grandmother along with the mother, who was then 14 years old. However, the mother was often absent from the home for periods of time. After T.J.'s hospitalization, he was placed in the care of the Department of Children and Family Services (DCFS).

¶ 4    On May 15, 2018, the State filed a petition for adjudication of wardship as to T.J. and a motion for temporary protective custody. The State maintained that T.J. was neglected or abused, pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1, *et seq.* (West 2018)). In support of this claim, the State alleged that, during his hospitalization at Stroger, T.J. was diagnosed with non-organic failure to thrive and found to be developmentally delayed. N.R. was imprisoned in a state correctional facility. The mother was psychiatrically hospitalized due to self-harm behaviors and suffers from various psychiatric disorders.

¶ 5    On May 15, the circuit court appointed a guardian *ad litem* (GAL) for T.J. and placed the minor in the temporary custody of DCFS. The office of the Cook County Public Defender was appointed to represent N.R. The court subsequently entered an order finding N.R. to be T.J.'s father based upon genetic testing.

¶ 6    After the matter was continued several times, the circuit court held an adjudicatory hearing on November 5, 2018. After the hearing, the court entered an adjudication order finding that T.J. was neglected based on a lack of care (705 ILCS 405/2-3(1)(a) (West 2018)) and injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)). A dispositional hearing was set for December 14, 2018.

¶ 7    A DCFS family service plan was filed with the court on the date set for the dispositional hearing. The plan revealed that N.R. continued to be incarcerated and the mother, as a ward of the court, had been placed in specialized foster care. When hospitalized in May 2018, T.J.'s weight was below the third-percentile category for his age (11 months), and his height and his developmental age was that of a five-month-old child. It was believed he had not been receiving proper nutrition. His caretakers reported that T.J. spent much of his time on his back without mental and physical stimulation. T.J. needed physical, occupational, and speech therapies, and an environment which stimulated his social, emotional, and physical growth. Additionally, T.J. was to see a neurologist and orthotic specialist. After his hospitalization, T.J. had been living with his foster parents where he was receiving appropriate care and treatment. He was gaining weight and function.

¶ 8    On that date, the court entered a disposition order. In this order, T.J. was adjudged a ward of the court based on findings that the parents were unable for some reason other than financial

circumstances alone to care for him. The case was set for a permanency planning hearing on March 6, 2019.

¶ 9    On that date, DCFS filed a permanency hearing report and a family service plan. The report indicated that the mother was not in services, was not in contact with the case worker and was reportedly "on the run." The father continued to be incarcerated and was not in services. T.J. remained with his foster parents, had gained weight but was still underweight, and required various therapies to assist with his developmental and physical delays. A nutrition specialist regularly came to the foster home. T.J. was happy and affectionate and supported by his foster family. The service plan stated that the foster parents had taken T.J. to all his appointments and had followed all recommendations. The court entered an order finding the parents had not made substantial progress on services and set a permanency hearing for September 4, 2019, with a goal of return home in 12 months.

¶ 10    DCFS filed a permanency hearing report and a family service plan on September 4, 2019, that revealed that the mother was still missing. In his foster home, T.J. continued to receive the necessary therapies and medical and nutritional assistance. T.J., who was two years old, had multiple complex medical conditions with no known cause despite ongoing medical investigations. The plan included detailed and extensive reports and assessments from T.J.'s medical providers, nutritionist, therapists, and others.

¶ 11    In addition to a non-organic failure to thrive and developmental delay, T.J. had been diagnosed with low muscle tone, asymmetrical head, microcephaly, difficulty swallowing, lazy eye, and a reactive airway. He has ankle braces, a compression vest, and uses a stander. The report underlined that "[t]he next 12-24 months are critical in predicting future prognosis, including independent mobility." T.J.'s foster parents attend every medical appointment, document T.J.'s

progression, and communicate with the case manager. They continue to advocate strenuously for T.J.'s medical needs and to provide emotional support. The foster parents were committed to permanency. On September 4, 2019, the court entered a permanency order which established a goal of substitute care pending court determination on termination of parental rights and prohibited T.J.'s removal from the foster home pending further order of the court.

¶ 12    On March 4, 2020, a date originally set for the termination hearing, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption, which set forth the basis of the parents' alleged unfitness under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) and section 2-29 of the Act (705 ILCS 405/2-29 (West 2020)). The supplemental petition asserted that the parents failed to maintain a reasonable degree of interest, concern or responsibility as to T.J.'s welfare (750 ILCS 50/1(D)(b) (West 2020); 705 ILCS 405/2-29 (West 2020)), or to make reasonable efforts to correct the conditions which were the basis for the removal of T.J. from his home or toward the return of T.J. to them within nine months after the adjudication of neglect or abuse, or within any nine month period after this finding (750 ILCS 50/1(D)(m) (West 2020); 705 ILCS 405/2-29 (West 2020)). Additionally, the State alleged that the father had behaved in a depraved manner (750 ILCS 50/1(D)(i) (West 2020); 705 ILCS 405/2-29 (West 2020)). The supplemental petition asserted that T.J.'s foster parents wished to adopt him and that adoption would be in the best interest of T.J. The State would later amend this pleading to set forth the specific nine-month time frames as November 5, 2018 to August 5, 2019; August 5, 2019 to May 5, 2020; and April 5, 2020 to January 5, 2021.

¶ 13    As such, the termination hearing on the original petition did not go forward as scheduled on March 4, 2020. The proceedings up to and including this court date had been completed in-

person and in the courthouse. However, the reports of proceedings contained in the record reflect that all subsequent court dates were conducted by video conference.

¶ 14    This occurred because in March 2020, the Governor of the State of Illinois declared a state of emergency in response to the global COVID-19 pandemic and issued mandates limiting indoor and outdoor gatherings where social distancing measures could not be maintained. In response, the Illinois Supreme Court and lower courts issued orders to mitigate health risks associated with in-person court appearances. Due to the fluidity of the circumstances, the courts periodically changed such orders in response to public health data. Relevant here, on March 23, 2020, the Circuit Court of Cook County entered a general order, amended on September 3, 2020, providing that: "all matters *** shall be conducted by video conference to the extent reasonably possible, subject to the limitations imposed by the Constitutions of the United States and the State of Illinois; at the discretion of the judge presiding, after considering party objections, proceedings may be conducted by teleconference, videoconference, in person, or a combination of those means ***." September 3, 2020-02 Cook County Cir. Ct. G.A.O.

¶ 15    During this time period, the Illinois Supreme Court amended Rule 241, to read:

"The court may, upon request or on its own order, for good cause shown and upon appropriate safeguards, allow a case participant to testify or otherwise participate in a civil trial or evidentiary hearing by video conferencing from a remote location." Ill. S. Ct. R. 241 (eff. May 22, 2020).

A "case participant includes any individual involved in a civil case including the judge presiding over the case, parties, lawyers, guardians *ad litem*, minors in the care of [DCFS], witnesses, experts, interpreters, treatment providers, law enforcement officers, DCFS caseworkers, and court reporters." Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020)). "Good cause is likely to

arise when a witness is unable to attend trial for unexpected reasons, such as accident, illness, or limited court operations, but also in foreseeable circumstances such as residing out of state." *Id*.

¶ 16    After the mandates were imposed, proceedings in cases pending in the Child Protection Division, where this case was filed, were conducted remotely, including by video conference on Zoom.

¶ 17    On July 22, 2020, DCFS filed a permanency hearing report and a family service plan which set forth the following background. The mother had been "on the run" from August 2018 to September 28, 2019, when she turned herself into the police. The father was still in custody and there were pending charges relating to his criminal sexual assault of the mother. With the support of the foster parents, T.J. continues with his required therapies and medical treatment and has made progress.

¶ 18    On December 17, 2020, the court held a case management conference in preparation for the termination hearing. The attorney for N.R. indicated that he wished to file a written objection to the termination hearing being conducted by video conference and a briefing schedule was entered. The circuit court set a permanency hearing and a hearing on a motion relating to "Zoom objection" for January 28, 2021.

¶ 19    On January 5, 2021, N.R. filed an objection to conducting the termination hearing by video conference, contending that such a hearing would subject him to the possible deprivation of his parental rights without due process of law and would violate his statutory right to be physically present at the hearing, under section 405/1-5 of the Act (705 ILCS 405/1-5(1) (West 2020)). Alternatively, he moved for a continuance until such time as an in-person termination hearing could be conducted in accordance with COVID-19 safety protocols. The other parties did not file a written response.

¶ 20     On January 28, 2021, the prison did not have available equipment for N.R. to appear by video conference. With N.R. absent, the court did not proceed with the termination hearing but did proceed on N.R.'s objection to the hearing being conducted by video conference and his motion to continue. The attorney for N.R. "rested" on his written pleading. The GAL maintained that he believed due process required an in-person termination hearing but also said that it was in T.J.'s best interest that the hearing take place "as soon as we can." The State asserted that it was in T.J.'s best interest to "proceed as early as we can regardless of the manner in which we proceed." Because it was necessary to continue the termination hearing in light of N.R.'s absence, the court continued the termination hearing to April 16, 2021. The court also deferred ruling on N.R.'s objection to conducting the hearing by video conference and motion to continue on the chance that the termination hearing could be safely held in-person at that time.

¶ 21     On April 16, 2021, at the outset of the hearing, the court reiterated that it had deferred the ruling on N.R.'s objection to having a termination hearing by video conference and motion for continuance of that hearing in the event that " juvenile court was in session, in person ***." However, as the court explained, the "Child Protection Division is still exclusively being heard via Zoom so I am going to respectfully deny the request for an in-person hearing or to proceed other than by Zoom." The court continued:

> "I feel that the parents['] right to confront witnesses, to hear the evidence are—and
> to their due process are satisfied by proceeding on Zoom. I would make sure that I could
> hear all the witnesses['] testimony, that I would ensure that the witnesses were in a place
> by themselves so no one else could hear the testimony. The *** parents['] attorneys have
> an adequate *** [opportunity] to cross-examine witnesses, confer with their clients at any
> time and I will make sure that the witnesses are not referring to any other notes or doing

anything improper with regard to their testimony. I feel that the safety of the participants given the current state of the pandemic is a compelling interest for *** proceeding by Zoom and I don't feel that *** any of the parents['] rights that would be violated by proceeding by way of Zoom so I'm going to respectfully deny the request to proceed by in person only and we will proceed with the hearing."

¶ 22    The court then placed the witnesses in a Waiting Room on the Zoom platform until each witness was called to testify, to comply with a motion to exclude witnesses.[1] During the hearing, the court muted those participants who were not speaking so that the proceedings could be heard by all participants.

¶ 23    The fitness portion of the termination hearing was held over two days, on April 16 and May 24, 2021. On both days, N.R. was present on the Zoom platform. Additionally, his attorney participated in the proceedings and conducted cross-examinations of the witnesses. A court reporter was also present on both court dates and transcribed the proceedings.

¶ 24    The State called as witnesses: Amy Gordon, Jasmine Noggins, and Francee Henley, who had each been assigned by either DCFS or a service provider to T.J.'s case at different periods of time. Before each of the witnesses testified, the court inquired whether the witness was in a room by herself, and each witness indicated that she was. The court admonished each witness to testify solely from their memory and not to use any notes, documentation, or electronics to assist in their testimony, unless they were directed to do so.

---

[1] The Waiting Room function of the Zoom application allows the host to control when a participant joins the meeting. See, *Waiting Room*, support.zoom.us/hc/en-us, https://support.zoom.us/hc/en-us/articles/115000332726-Waiting-Room (last visited October 4, 2021).

¶ 25    The witnesses testified to the outstanding services and lack of progress on the part of the parents, that the whereabouts of the mother were unknown at the start of the case, and that N.R. had been incarcerated throughout the proceedings. During their testimony, when necessary, the witnesses (and the attorneys) were sent exhibits by email in order to answer any relevant questions. One of the exhibits entered into evidence was a June 22, 2018, Integrated Assessment. Reflected therein was the fact that the mother was brought to the emergency room on October 17, 2016, just after she had turned 13 years old. Testing established that the mother was six to eight weeks pregnant, and N.R.—then 31 years old—was identified as the likely father as he had sexually assaulted C.J. the prior month.

¶ 26    On the second day of the fitness hearing, the court allowed the admission of a certified copy of N.R.'s conviction for predatory criminal sexual assault to a victim under the age of 13 years old in case number 18 CR 1067601, resulting from his plea of guilty on May 5, 2021. Neither N.R. nor the mother called witnesses or testified at the fitness hearing.

¶ 27    On that date, May 24, 2021, the court found N.R. unfit on the grounds of depravity; a failure to maintain a reasonable degree of interest, concern, and responsibility; and a failure to make reasonable progress. As to the depravity ground, the court noted that N.R.'s conviction for predatory criminal sexual assault of a child raised a rebuttable statutory presumption of his depravity, which could be overcome only by clear and convincing evidence. As to the other grounds, the court noted that the fact that N.R. was incarcerated was not a defense. The court also found the mother unfit for her failure to make reasonable progress.

¶ 28    The circuit court proceeded to conduct a best-interest hearing by video conference. Henley testified that T.J. was placed in a specialized, non-relative foster home, and had been there since May 14, 2018. T.J. has special needs in that he has a history which includes a failure to thrive,

global developmental delays, low muscle tone, and cerebral palsy. The foster parents made T.J. available for all services and appointments. Henley visits the foster home three times a month. On her visits to the foster home, Henley found T.J. to be happy and bonded with the foster parents. DCFS recommended that parental rights be terminated. Henley felt adoption would be in T.J.'s best interest in that he has been in the pre-adoptive foster home for over three years. The foster home has provided T.J. with a stable environment with foster parents who are "exceptional advocates for [T.J.'s] needs." Henley did not recommend that T.J. have visitation or contact with N.R.

¶ 29    Both foster parents were present at the best-interest hearing, but only the foster mother was called to testify. The foster mother testified to their strong bond with T.J. and the many aspects of their home life. She spoke of their devotion to T.J. and to addressing his needs. The foster parents wish to adopt T.J. They have allowed the mother to have a relationship with T.J., and if the adoption took place they would make sure that the mother continued to have contact with T.J.

¶ 30    The mother testified that because of the circumstances surrounding T.J.'s birth, at first she did not want to be with him. The mother loves T.J. and has changed in that she now "wants to be around him." If her parental rights were terminated, the mother wished to have contact with him. N.R. did not testify or present any witnesses at the best interest hearing.

¶ 31    At the conclusion of the best-interest hearing, the court reviewed the evidence and emphasized that T.J. has multiple special needs which the foster parents have been addressing and that over the years, T.J. has bonded with them. The court concluded that it was in T.J.'s best interest to terminate the parental rights of N.R. and the mother. On May 24, 2021, the court entered a written order consistent with its findings after the fitness and best-interest hearings. The court also appointed DCFS as guardian for T.J. with the right to consent to adoption. N.R. has now appealed.

¶ 32     On appeal, N.R. does not challenge the court's unfitness and best-interest findings, or point to any evidentiary errors or any restrictions or limitations on his examination of the State's witnesses or his presentation of witnesses, evidence, or argument in defense of his fitness or ability to parent T.J. Therefore, any objections to those findings and orders have been forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); see also *In re R.D.*, 2021 IL App (1st) 201411, ¶ 5; *In re Julieanna M.*, 2018 IL App (1st) 172972, ¶ 3 (where consideration of the court's findings were not necessary where respondents solely argued constitutional issues). Nevertheless, we briefly address those findings and find that they were supported by the manifest weight of the evidence, a conclusion that will inform our analysis of the issues N.R. has actually raised on appeal.

¶ 33     The Act provides a "step-by-step" process for deciding whether a child should be removed from his or her parents, made a ward of the court, and whether parental rights should be terminated. *In re Arthur H.,* 212 Ill. 2d 441, 462 (2004). After a petition for wardship has been filed and a child has been placed in temporary custody, the circuit court first must determine whether a child is abused, neglected, or dependent, before it conducts an adjudication of wardship and dispositional hearing. *Id.*; 705 ILCS 405/221 (1), (2) (West 2020). The dispositional hearing and ruling on wardship give "the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *In re J.B.*, 2018 IL App (1st) 173096, ¶ 26 (quoting *In re April C.*, 326 Ill. App. 3d 225, 237 (2001)).

¶ 34     Parental rights may be involuntarily terminated where: (1) the State proves that a parent is unfit pursuant to one of the grounds set forth in section 1(D) of the Adoption Act and (2) the trial court finds that termination is in the child's best interest. *In re M.R.*, 393 Ill. App. 609, 613 (2009); 705 ILCS 405/1-1 *et seq.* (West 2020). The State bears the burden of proving by clear and convincing evidence that a parent is unfit under a ground contained in section 1(D) of the Adoption

Act. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). Any single ground, properly established, is sufficient for a finding of unfitness. *Id.* at 495. "Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a finding of unfitness only where it is against the manifest weight of the evidence. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." (Internal citations omitted) *In re Deandre P.*, 405 Ill. App. 3d 945, 952 (2010). A reviewing court may not substitute its judgment for that of the circuit court regarding the credibility of witnesses, the proper weight to be accorded the evidence, or the inferences to be drawn therefrom. *D.F.*, 201 Ill. 2d at 499.

¶ 35    The Adoption Act provides that depravity is a ground for a finding of parental unfitness and that a conviction for predatory sexual assault of a child "creates a presumption that a parent is depraved which can be overcome only by clear and convincing evidence." 750 ILCS 50/1 (D)(i) (West 2020). Thus, once the certified copy of N.R.'s conviction for predatory sexual assault was entered into evidence below, a finding of unfitness would be justified unless the father overcame the presumption of depravity by clear and convincing evidence. *In re Donald A.G.*, 221 Ill. 2d 234, 239, 252 (2006) (finding that a certified copy of a conviction for predatory criminal sexual assault was enough to create a rebuttable presumption of depravity, while citing 750 ILCS 50/1(D)(i) (West 1998), which did not yet enumerate the offense of predatory criminal sexual assault). The father failed to present any evidence below and has not argued on appeal that he was prevented from doing so because of the manner of conducting the termination hearing. We find that the circuit court's determination of N.R.'s unfitness was therefore supported by the manifest weight of the evidence.

¶ 36    We also find no error in the court's determination that it was in T.J.'s best interest that N.R.'s parental rights be terminated. Throughout the case, N.R. was incarcerated and did not

participate in services. He pled guilty to the crime of predatory sexual assault of the mother, a crime which led to T.J.'s birth and the mother's initial disinterest in T.J. T.J., on the other hand, has been placed successfully in a stable and supportive specialized foster care home. He began living in the foster home when he was undernourished and developmentally delayed. Over the years he has been with them, the foster parents have managed T.J.'s care and assured that his complex medical needs are being addressed by medical providers such as doctors, therapists and a nutritionist. The foster parents and T.J. have an evident and strong bond. The circuit court's best-interest finding was therefore supported by the manifest weight of the evidence.

¶ 37    Instead of arguing the merits of these findings on appeal, N.R. maintains that holding the termination hearings by video conference violated his constitutional right to due process and his statutory right to be present at the hearings. N.R. further maintains that the circuit court abused its discretion in denying his request that the termination of parental rights hearing be continued until in-person proceedings could be held. We disagree.

¶ 38    "Procedures involved in terminating parental rights must meet the requirements of the due process clause." *Julieanna M.*, 2018 IL App (1st) 172972, ¶ 14. Due process requires an opportunity to be heard "at a meaningful time and in a meaningful manner." *R.D.*, 2021 IL App (1st) 201411, ¶ 19 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). "Due process is flexible and calls for such procedural precautions as the particular situation demands." *Id.* Courts have used the factors discussed in *Mathews*, 424 U.S. at 319, in determining whether termination of parental rights proceedings satisfied the requirements of due process. See *R.D.*, 2021 IL App (1st) 201411, ¶¶ 19-21 (termination proceeding by video conference did not violate due process); *In re R.L.,* 2021 IL App (1st) 210419, ¶ 15 (same); *In re M.R.*, 316 Ill. App. 3d 399, 402 (2000) (termination proceeding in absence of the respondent did not violate her due process rights). Those

factors are: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used; and (3) the government's interest. *Mathews*, 424 U.S. at 334-35; *In re J.M.*, 2020 IL App (2d) 190806, ¶ 41. We review *de novo* claims of violations of due process. *J.M.*, 2020 IL App (2d) 190806, ¶ 37.

¶ 39    As to the first factor, N.R. has a fundamental interest in maintaining a parental relationship with T.J. *In re Br. M.*, 2021 IL 125969, ¶ 40; *In re D.R.*, 307 Ill. App. 3d 478, 483 (1999). However, T.J. has a protected interest in being raised in a " 'loving, stable, and safe home environment.' " *Julieanna M.*, 2018 IL App (1st) 172972, ¶ 25 (quoting *In re D.T.*, 212 Ill. 2d 347, 363 (2004)).

¶ 40    As for the second factor, the risk of an erroneous deprivation of N.R.'s parental relationship with T.J. due to proceeding by way of a video conference, we first reiterate that N.R. *provided no evidence* to rebut the statutory presumption that he was unfit based on depravity. Nor did he provide *any evidence* to counter the evidence that termination of his parental rights was in T.J.'s best interests, where N.R. remained incarcerated and unengaged in any services while the adoptive parents consistently provided for T.J.'s needs and had created a strong bond with the minor. Nor does he specifically identity any evidence that the procedure used here precluded him from introducing below. It is difficult to imagine any significant risk of an erroneous deprivation of N.R.'s parental relationship with T.J. under such circumstances.

¶ 41    We also note that the circuit court specifically admonished each of the witnesses at the unfitness hearing that they must testify in private without anyone else in the room (and ensured that was in fact the case with respect to each witness), had to testify from memory and should not rely on any notes, and should only refer to specific documents provided electronically by the attorney doing the questioning, in order to comply with the requirements of Rule 241. Ill. S. Ct. R. 241, Committee Comments (rev. May 22, 2020)). While N.R. complains that the trial court did not

provide Henley these admonishments a second time when she again testified during the best-interest hearing, he provides no authority supporting the need to do so. Additionally, while the foster mother was not provided these admonishments prior to her testimony at the best-interest hearing, the parties specifically acquiesced to the foster father being present while she testified, and no party raised an objection when the foster mother asked and was permitted to read from a prepared statement during a portion of her testimony. There is also nothing in the record to suggest that the foster mother violated any of these requirements in any other way. Furthermore, it is clear from the record that N.R.'s counsel took full opportunity to cross-examine the witnesses presented at the hearings.

¶ 42    As to the second factor, N.R. lastly complains that the court never specifically explained to him that he had the opportunity to confer with his counsel in a "breakout room" over Zoom. He then contrasts the circumstances here with those in *In re P.S.*, 2021 IL App (5th) 210027, ¶ 64, where the court affirmed the use of Zoom in circumstances similar to those at issue here only after specifically noting that the "Father conferred with his counsel in a breakout room four times during the hearing." However, there the court also relied on the fact that "the court never denied a request from Father or his counsel to be placed in a breakout room for a consultation or to exchange notes," and the same is true here where no such request was ever made. Furthermore, as N.R. himself acknowledges in his brief, "there is no way of knowing if he was impeded or inhibited" from providing his counsel with information useful for cross-examination. His contention of prejudice as to this factor is therefore entirely speculative.

¶ 43    As to the third factor, the challenged procedures accomplished important public goals. The government had an interest in avoiding additional delay in finding permanency for T.J. See *Lassiter v. Department of Social Services*, 452 U.S. 18, 32 (1981) ("Child-custody litigation must

be concluded as rapidly as is consistent with fairness."); *In re D.L.*, 191 Ill. 2d 1, 13 (2000) (finding that keeping a child in limbo for an extended period of time is not in her best interest); *In re N.T.*, 2015 IL App (1st) 142391, ¶ 57 (finding that further delay would also have imposed additional fiscal costs and administrative burdens on the State). Further, the government had an interest in avoiding in-person hearings to mitigate the public health risk posed by the global pandemic.

¶ 44 Ultimately, when balancing each of these factors, we find that conducting the termination hearings via video conference did not violate N.R.'s procedural due process rights. In reaching this conclusion, we note again that other Illinois courts have come to the same conclusion under similar circumstances. *R.D.*, 2021 IL App (1st) 201411, ¶¶ 19-21; *R.L.,* 2021 IL App (1st) 210419, ¶ 15; *M.R.*, 316 Ill. App. 3d at 402.

¶ 45 N.R. next contends that holding the termination hearings by video conference violated his statutory right to be present at the hearings. As relevant here, section 405/1-5(1) of the Act provides: "the minor who is the subject of the proceeding and [their] parents *** have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records, and *** to be represented by counsel." 705 ILCS 405/1-5(1) (West 2020). However, and as N.R. himself acknowledges, these rights are not absolute. *M.R.*, 316 Ill. App. 3d at 402. We review *de novo* questions of statutory compliance. *In re H.P.*, 2019 IL App (5th) 150302, ¶ 24; *People v. Thompson*, 383 Ill. App. 3d 924, 929 (2008).

¶ 46 In support of this argument, N.R. first cites to caselaw standing for the proposition that a criminal defendant has a right to be present during "fundamentally important" proceedings. However, "[u]nlike criminal proceedings, the termination of parental rights is governed by the Adoption Act, all matters attendant thereto are civil in nature, and the general rules of civil practice

apply." *P.S.*, 2021 IL App (5th) 210027, ¶ 73 (citing *In re J.R.*, 342 Ill. App. 3d 310, 315 (2003), and 750 ILCS 50/20 (West 2020)).

¶ 47    As at least one other court has recognized, the "question of whether the statutory right to be present, in the civil context, requires an 'in person' presence has not yet been decided by our supreme court." *P.S.*, 2021 IL App (5th) 210027, ¶ 72. Perhaps for that reason, N.R.'s argument in this regard consists of his sole contention that his statutory right to be present should be evaluated under the same due process standards discussed above. We are not convinced that this is correct.

¶ 48    As an initial matter, while our supreme court may not have ruled on the matter, the court in *P.S.*, 2021 IL App (5th) 210027, ¶ 73, specifically rejected the argument that "section 1-5(1) of the Act provides a parent a statutory right to demand an in-person hearing during termination proceedings." The P.S. court did so after noting that "[w]hile Rule 241 does not specifically state that remote participation is the same as the statutory right to be 'present' at a hearing, such a finding is implicit in the Rule's provision allowing persons to 'participate' remotely." *Id*. We agree with this analysis. Moreover, even if N.R. was correct and a due process analysis should apply to this question, we have already rejected his due process arguments for the reasons stated above and we therefore again reject them in this context.

¶ 49    Lastly, N.R. argues that the court abused its discretion in denying his motion for a continuance of the termination hearings until in-person hearings could be held.

¶ 50    N.R. does not have an absolute right to a continuance in a proceeding under the Act. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 31. We will not overturn the trial court's decision as to a continuance absent an abuse of discretion. *Id*. An abuse of discretion occurs if the ruling is arbitrary, fanciful, or unreasonable. *In re D.M.*, 2020 IL App (1st) 200103, ¶ 20. The denial of a

request for a continuance will be grounds for a reversal only "where the complaining party has been prejudiced by the denial." *In re M.R.*, 305 Ill. App. 3d 1083, 1086 (1999).

¶ 51    Again, our decision in *R.D.* provides guidance. *R.D.*, 2021 IL App (1st) 201411, ¶ 30. In that case, this court found that the court did not abuse its discretion in denying a motion for continuance during the global COVID-19 pandemic, until in-person termination hearings could be held. *R.D.*, 2021 IL App (1st) 201411, ¶ 30; see also *P.S.*, 2021 IL App (5th) 210027, ¶ 63 (also finding the circuit court did not abuse its discretion in denying a motion for a continuance of termination proceedings during the COVID-19 pandemic until an in-person hearing could be held); *R.L.,* 2021 IL App (1st) 210419, ¶ 17 (same). The *R.D.* court, citing *M.R.*, 305 Ill. App. 3d at 1086, noted that even if there was an abuse of discretion, the respondents did not show prejudice and therefore there were no grounds for reversal. *R.D.*, 2021 IL App (1st) 201411, ¶ 30. Here, just as in *R.D.*, the court's denial was based on the health risks associated with the global COVID-19 pandemic and the uncertainties as to when in-person hearings could be held safely. While N.R. suggests otherwise, it would have been pure speculation for the court to presume that in-person proceedings would soon begin again. Moreover, the termination hearings had already been postponed for months due to the prison's initial inability to make N.R. available. Thus, we find that the court did not abuse its discretion in denying N.R.'s motion for a continuance. Even if the court abused its discretion, N.R. makes no argument that he was prejudiced by the denial. Therefore, we find that there are no grounds for reversal in the denial of N.R.'s motion for a continuance.

¶ 52    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 53    Affirmed.