2022 IL App (2d) 210673-U
No. 2-21-0673
Order filed March 29, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* B.R., K.R., and A.R., | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Minors. | ) | |
| | ) | |
| | ) | Nos. 19-JA-61 |
| | ) | 19-JA-62 |
| | ) | 19-JA-63 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. Cassy G. | ) | Mary Linn Green, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding respondent mother unfit and terminating her parental rights.

¶ 2    Respondent, Cassy G., appeals from the judgment of the trial court, which found her unfit and terminated her parental rights. She asserts that her counsel was ineffective during the unfitness and best-interests hearings. We affirm.

¶ 3                               I. BACKGROUND

¶ 4     As Cassy does not contest whether the State's evidence was sufficient to find her unfit and terminate her parental rights, we can confine our discussion to the matters that are disputed.

¶ 5     Cassy is the mother of three boys: A.R. (born February 2011), K.R. (born April 2012), and B.R. (born January 2015). All three children have the same father, José R.; however, this appeal concerns only Cassy's rights over the children.

¶ 6     On November 30, 2018, the Department of Children and Family Services (DCFS) received a report that Cassy found José watching child pornography on his phone. Cassy would often leave the children in José's care for days at a time. José was unemployed, and when Cassy would return home, José "w[ould] be passed out drunk." There were also reports of domestic violence between José and Cassy, and both admitted to smoking marijuana. In addition, none of the children were enrolled in school.

¶ 7     A DCFS investigation determined that the allegations were largely unfounded, except that seven-year-old A.R., and six-year-old K.R. had never been enrolled in school. An intact case was opened, and the parents were given one week to enroll A.R. and K.R. The DCFS investigator noted concerns with José's admission to drinking around the children and both parent's marijuana use.

¶ 8     An integrated assessment showed that Cassy had significant mental health challenges. Specifically, Cassy had several prior suicide attempts and reportedly suffered from bouts of anxiety and depression. These issues were exacerbated both by her relationship with José, which was mutually physically abusive, as well as difficulties with parenting the children. Cassy reported that she felt " 'overwhelmed' " by the children—one evaluator described her affect as "detached"—and would often leave the home for weeks at a time forcing José to be the primary caregiver.

¶ 9    On February 15, 2019, the State filed neglect petitions. Additional investigation revealed that José was drinking alcohol in violation of a court order prohibiting him from doing so. In the underlying traffic case, José pled guilty to DUI and child endangerment, for driving the children while he was intoxicated. In addition, A.R. and K.R. had missed five days of school since their enrollment and were declared truant.

¶ 10    On May 2, 2019, Cassy reportedly no longer lived in the home, and José was the children's sole caretaker. Cassy waived her right to a shelter-care hearing and agreed that DCFS should have temporary guardianship and custody of the children. Then, on May 13, 2019, Cassy stipulated to the State's neglect petition, and further stipulated that she was unwilling or unable to care for the children. The children were adjudicated neglected and made wards of the court.

¶ 11    Cassy's service plans called for her to complete mental health, substance abuse, and parenting services. Throughout the permanency hearings, Cassy was found not to have made reasonable progress towards reunification and had completed virtually none of the goals in her service plan. Cassy was often unemployed and did not have suitable housing for the children. Cassy was initially compliant with weekly supervised visitation, but the visitation format and schedule had to be altered due to Cassy and José engaging in arguments in front of the children. In addition, most of Cassy's drug and alcohol screenings were marked positive due to Cassy's failure to appear or complete testing.

¶ 12    Due to the COVID-19 pandemic, beginning in March 2020, most visitation and court hearings were held via video, or a combination of video and in person.

¶ 13    On June 22, 2021, the State filed petitions to terminate Cassy's parental rights. The petitions in all three cases presented the same allegations: that Cassy failed to (1) maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (750 ILCS

50/1(D)(b) (West 2020)); (2) make reasonable efforts to correct the conditions that were the basis for the children's removal during a nine-month period following adjudication (*id.* § 1(D)(m)(i)); and (3) make reasonable progress toward the children's return during a nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(ii)).

¶ 14    An unfitness hearing began on July 20, 2021. The State called Janette Givens, the children's caseworker with Lutheran Social Services of Illinois (LSSI) since 2019. Givens stated that Cassy completed only two of 23 drug and alcohol screens while the case was in care. Of the two Cassy completed, one was positive. Cassy's failure to comply with substance abuse testing prevented her from being enrolled in parenting classes. With respect to mental health counseling, Cassy was twice engaged in outpatient services, but was discharged unsuccessfully both times for lack of attendance. Cassy had regular supervised and online visitation with the children, and she was appropriate "for the most part" during visits. But due to her failure to engage in other services, Cassy never progressed to unsupervised visitation. During the course of the case, Cassy often asked about her children, but never provided them with food, clothes, or monetary support.

¶ 15    Through Givens, five of Cassy's service plans were admitted into evidence. The service plans covered the two-year period from May 2019 through May 2021. All of the service plans were rated unsatisfactory.

¶ 16    As it is relevant to respondent's argument on appeal, we note that during her direct examination, there were five instances where Givens was asked a question, answered the question, and then added that she "would have to look at [her] notes" to be sure. During one exchange, the court explained that although Givens was testifying remotely, she could not simply look at her notes on her own. As Givens testified, the State never sought to refresh her recollection by

producing her notes (see generally Ill. R. Evid. 612 (eff. Jan. 1, 2011)), and there is no indication in the record that Givens was reading from them.

¶ 17    Next, José's attorney briefly questioned Givens. Then, on cross-examination by Cassy's attorney, Givens explained that Cassy obtained a second mental health assessment in February 2021 but never reengaged in mental health services. Then, the following exchange occurred:

> "MS. KHAN [(Cassy's Attorney)]: Your Honor, at this time I'm going to motion to continue TPR. I feel like cross examination is not -- I cannot be effective if I have a witness on Zoom and she keeps referring to, 'I need to look at my notes. I need to look at my notes.' That would be my motion.
>
> THE COURT: Well, we wouldn't let her look at her notes if she was in person –
>
> MS. RIPPER [(Assistant State's Attorney)]: Right. I was going to –
>
> THE COURT: –but I–
>
> MS. PETERMAN [(DCFS Regional Counsel)]: I would have no objection to doing that.
>
> THE COURT: But what I was going to say is, you could refresh her recollection.
>
> MS. PETERMAN: Right.
>
> THE COURT: So we're not going to finish this today anyway, I understand. What's our next date?
>
> MS. KHAN: Our next date is 8/19, 9:00 o'clock [*sic*].
>
> [* * *]
>
> THE COURT: All right. Here's what we're gonna do. I'm going to continue this. We need to have you here, Ms. Givens, for that August 19th at 9:00 a.m. time. Okay? *** We'll pick up with your [Ms. Khan's] cross-examination of this witness.
>
> MS. KHAN: And, Your Honor, my client, the mother Cassy G[.], does plan on testifying.
>
> THE COURT: Okay. And she may not. So, we never know. Okay. So that

is for continued unfitness."

¶ 18    The hearing then resumed with Givens testifying in person. Givens explained that Cassy's service plan called for her to engage in individual counseling, but a prerequisite for individual sessions was that she engage in at least 18 group sessions. Cassy only completed 13 group sessions, so she never graduated to individual counseling.

¶ 19    Cassy obtained employment at a McDonalds, but Givens testified that she had difficulty getting ahold of Cassy, who could only text or call Givens if her phone was on a wireless network.

¶ 20    Throughout the pendency of the case, Givens said, Cassy was consistent with her visitation with the children. Givens also explained that Cassy's final drug screening was "a clean drop." Givens then "work[ed] with the facilitator" of the parenting classes to try to get Cassy back on the waiting list based on the negative drug test, but by then, it was too late; the children's permanency goal was changed to substitute care and "agency policy is once the goal changes in the court [caseworkers can] no longer put in referrals for services for [their] clients."

¶ 21    After additional questions by the attorneys, Givens stepped down, the court admitted evidence based on the parties' stipulations and took judicial notice of prior court orders. With that, the State rested.

¶ 22    Cassy then testified that she was 31 and was the mother of three children who were the subject of this case. Cassy also "started [her] mental health services the other day." She was diagnosed with post-traumatic stress disorder and borderline personality disorder. Her treatment consisted of one-on-one counseling.

¶ 23    By the time of the hearing, Cassy had been employed at the fast food restaurant for nearly a year. She also denied being in a relationship with José, citing the service plan recommendation regarding domestic violence.

"Q. [(Ms. Khan, Cassy's attorney)] Okay. Do you understand the concerns the agency has with you being a protective parent towards your children—

A. I do.

Q. —as far as other men are concerned?

A. Yes.

Q. Could you provide me examples of how you would be protective if your kids were returned to you?

A. Make sure they were in school, that would be my number one. Just -- I don't even know how to answer that. Make sure they're in school to avoid all this again. I don't want to go back down this road again.

Q. What about to protect them from domestic violence or witness domestic violence or have anything to do with it?

A. Just keep *him* away from me. I mean, there is really nothing—I don't even know how to answer that." (Emphasis added.)

With respect to Givens, Cassy stated that they communicated "a lot" but that she did not "really see eye to eye" with Givens.

¶ 24 On cross-examination, Cassy confirmed that she never completed any of the services outlined in her plans. She also did not recall whether Givens told her about the rules and procedures that had to be followed for services. Cassy stated that the reason A.R. and K.R. were not enrolled in school was because she was "working full time" and "overnights" "when all this happened" so she would get home and sleep when it would have been time to take the children to school. Cassy further stated that she had been prescribed medication for her personality disorder, but because she "just didn't like it" she "decided personally to stop taking them." No additional evidence was presented on unfitness.

¶ 25 The trial court found that the State presented clear and convincing evidence of Cassy's unfitness on each count and the matter proceeded to a best-interests hearing.

¶ 26    At the time of the hearing B.R. was six, K.R. was nine, and A.R. was ten. Givens testified that the children were initially placed with Cassy's mother; however, the children were moved because Cassy's mother could not care for them. Eventually, A.R. was placed in the home of foster father Mark W., and K.R. and B.R. were soon placed there as well. Mark had an older adopted son in the home as well. A.R. was in Mark's home for nearly a year, and K.R. and B.R. had been there for four months. The children also received services and mental health counseling through DCFS.

¶ 27    Although the children had only been together in the home for four months, Givens felt they were doing well. The children had a sense of stability with Mark and looked up to their older foster brother, Austin. Mark was committed to adopting the children and all of the children expressed a desire to live with Mark. Conversely, none of the children's biological relatives expressed interest in caring for them. On cross-examination, Givens explained that although the children miss their mother, they told Givens, "[W]e like it here; we want to stay here forever."

¶ 28    After Givens testified, Cassy's attorney stated that Cassy wished to testify. A short break was taken and when the hearing resumed, Cassy's attorney stated that, on second thought, "she has chosen not to testify."

¶ 29    The children's guardian *ad litem* called Mark as a witness. Mark explained that the children were well integrated into his household and had bonded with Mark's extended family. Mark stated that he "absolutely" wanted to adopt them. Mark also stated that he would facilitate visits between Cassy and the children if that was appropriate. After Mark's testimony, the trial judge asked him several questions and looked at pictures Mark brought of the children engaging in various activities and having fun.

¶ 30    After closing arguments, the trial court found that it was in the children's best interests to terminate Cassy's parental rights and set the children's permanency goal to adoption. The court

also questioned Cassy, who was now no longer employed, and appointed appellate counsel to represent her. Cassy then filed her notice of appeal.

¶ 31                                II. ANALYSIS

¶ 32    On appeal, Cassy contends that her trial counsel was ineffective at various points during the unfitness and best-interests hearings. Specifically, Cassy asserts that counsel was ineffective for: (1) failing to object to Givens testifying using Zoom on the first day of the unfitness hearing; (2) failing to object on hearsay grounds to Givens' testimony regarding an indicated packet, the integrated assessment, and Cassy's service plans; (3) calling Cassy as a witness during the unfitness hearing; (4) failing to object to the trial court's statement that it would take judicial notice of its prior permanency review findings when considering unfitness; and (5) failing to call Cassy as a witness during the best-interests hearing.

¶ 33    It is worth pointing out that Cassy does *not* assert that the trial court's unfitness or best-interests findings were against the manifest weight of the evidence. In addition, much of Cassy's brief is deficient for failing to develop her arguments or cite pertinent authority. *Cf.* Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Finally, and perhaps most glaringly, Cassy's brief fails to cite the Supreme Court rule that governs remote testimony (see Ill. S. Ct. R. 241 (eff. May 22, 2020)) even though her primary argument centers around the State's witness's remote testimony on the first day of the unfitness trial. As a result of these deficiencies, we would be within our rights to strike Cassy's brief and dismiss this appeal; however, in light of the important interests at stake, we choose to excuse Cassy's forfeiture and to address her claims on the merits. See *In re H.B.*, 2022 IL App (2d) 210404, ¶ 43 (Feb. 23, 2022).

¶ 34    With that said, we first address Cassy's arguments regarding ineffective assistance of counsel. Both the constitutional and the statutory right to counsel under section 1-5(1) of the Act

(705 ILCS 405/1-5(1)) imply a right to effective assistance. *In re Br. M.*, 2021 IL 125969, ¶ 42. Ineffective assistance of counsel claims are analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984). *In re Br. M.*, 2021 IL 125969, ¶ 43 (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984)). Under *Strickland*, a party must establish (1) his or her attorney's performance was deficient, *i.e.*, fell below an objective standard of reasonableness, and (2) prejudice. *Strickland*, 466 U.S. at 687; *People v. Smith*, 195 Ill. 2d 179, 187-88 (2000); *In re S.G.*, 347 Ill. App. 3d 476, 479 (2004). If either prong of the *Strickland* test is not satisfied, then the ineffective-assistance-of-counsel claim fails. *Strickland*, 466 U.S. at 697.

¶ 35     To establish deficient performance under the first prong of *Strickland*, one must overcome the strong presumption that the challenged action or inaction was the product of sound trial strategy. *People v. Houston*, 226 Ill. 2d 135, 144 (2007). As such, matters of trial strategy are generally immune from claims of ineffective assistance of counsel unless counsel's strategy was so unsound that counsel failed to conduct any meaningful adversarial testing of the State's case. *Smith*, 195 Ill. 2d at 188. In addition, the prejudice prong requires a reasonable probability, not just a mere possibility, of a different outcome. *In re K.O.*, 336 Ill. App. 3d 98, 111 (2002).

¶ 36     Cassy's first contention is that trial counsel should have objected to Givens' remote testimony on the first day of the hearing. According to Cassy, trial counsel "allowed the entire direct examination of Givens to be done by Zoom, *while she had her 'notes' in her hand ***.*" (Emphasis added.) We reject the assertion.

¶ 37     The record shows that while Givens stated several times that she would need to refer to her notes to be certain of her answers, she nevertheless answered those questions without actually consulting her notes. The trial court explained to Givens that she was not permitted to read anything other than what was shown to her by counsel, and the record indicates that Givens

understood the court's admonition. Although Givens said she would "need" to refer to her notes on several occasions, there is no indication that Givens was actually reading her notes, or even holding them, while testifying remotely. Furthermore, we find it highly unlikely that an experienced trial court judge, who saw and heard Givens' testify, would both admonish the witness about *not* reading from anything other than what the attorneys had showed her, but then permit the witness to do *precisely* what the court admonished her not to do. To the extent Cassy suggests otherwise, it was her burden to present a record on appeal that supports her claim and she has failed in that regard. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 38 While Cassy also suggests that Givens' remote testimony denied Cassy due process, we reject that assertion as well. The trial court received Givens' remote testimony pursuant to the framework of Supreme Court Rule 241 as well as the general need to hear testimony remotely due to the ongoing COVID-19 pandemic. When Cassy's attorney found it difficult to question Givens over Zoom, the court granted counsel's request to continue the trial and to have Givens complete her testimony in person. There was nothing improper about that procedure.

¶ 39 We note too that there have been multiple recent published and unpublished decisions discussing the use of remote testimony during the COVID-19 pandemic in abuse-and-neglect proceedings. All of these cases have found that the pandemic was good cause for conducting some or all of an abuse and neglect hearing remotely under Rule 241 without infringing on the respondent parent's right to be present for the hearing. We concur in that assessment. See *In re H.B.*, 2022 IL App (2d) 210404 (Feb. 23, 2022); *In re L.S.*, 2022 IL App (1st) 210824 (Jan. 27, 2022); *In re Es.C.*, 2021 IL App (1st) 210197 (Nov. 22, 2021); *In re T.J.*, 2021 IL App (1st) 210740-U (Oct. 21, 2021); *In re Aa.C.*, 2021 IL App (1st) 210639 (Oct. 15, 2021); *In re R.L.*, 2021 IL App (1st) 210419 (Oct. 4, 2021); *In re K.C.*, 2021 IL App (1st) 210305-U (Sep. 30, 2021); *In*

*re R.D.*, 2021 IL App (1st) 201411 (Aug. 27, 2021); *In re P.S.*, 2021 IL App (5th) 210027 (July 26, 2021).

¶ 40    Cassy next suggests that her trial attorney should have objected on hearsay grounds to Givens' testimony regarding Cassy's integrated assessment, service plans, and the indicated packet. Cassy neglects to mention that such documents are admissible at fitness hearings under the business records exception to the hearsay rule. *In re Z.J.*, 2020 IL App (2d) 190824, ¶¶ 52-72; Ill. R. Evid. 803(6) (eff. Sept. 28, 2018); 705 ILCS 405/2-18(4)(a) (West 2020)). Cassy does not allege that these documents were admitted without an adequate foundation; rather, she asserts that Givens lacked personal knowledge of all of the underlying events recorded in those documents. The hearsay nature of such evidence was well known to the court, and any hearsay in the evidence went to its weight, not its admissibility. *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 67. Accordingly, counsel was not ineffective for failing to object to admissible evidence.

¶ 41    Cassy also contends that her trial attorney was ineffective for calling her as a witness. The gist of this contention is that Cassy's testimony on direct examination damaged her case—particularly when she testified that she had completed "none" of the court-ordered services, stopped taking her prescribed psychiatric medication, and acknowledged not having enrolled B.R. and K.R. in school because she worked nights. Cassy asserts there was "simply no tactical, let alone strategic, value to [her] being called as a witness." We disagree. Although Cassy's testimony at times hurt her case, she also made the point that she loved her children, had been consistent with visitation, and candid about her domestic violence issues with José. Her testimony at least rebutted some of the State's case, and without it, the State's case would have been entirely unchallenged.

¶ 42    More importantly though, the decision whether to take the witness stand and testify belonged to Cassy, not counsel. See *People v. Knapp*, 2019 IL App (2d) 160162, ¶ 39 "As a general

rule, advice not to testify is a matter of trial strategy that does not amount to ineffective assistance of counsel unless counsel *refused* to allow [his or her client] to testify." (Emphasis added.) *Id*. Nothing in the record shows that Cassy's decision to testify at the unfitness hearing was anything other than her own deliberate choice. As such, Cassy's trial attorney cannot have been ineffective for allowing her to testify.

¶ 43    Cassy's fourth contention is that counsel was ineffective for not objecting when the State requested that the trial court take judicial notice of its permanency findings, and the court stated that it would. Such an objection would have been futile. It is imperative that the trial court consider its prior orders in an unfitness case, particularly where as here, a parent is alleged to have failed to make reasonable progress following a dispositional finding. See, *e.g.*, *In re M.D.*, 2022 IL App (4th) 210288, ¶ 79. Cassy cites no authority to support her position, which is unsurprising because there is none. The trial court did not err in taking judicial notice of its permanency findings and counsel was not required to make a useless objection. *People v. Peoples*, 377 Ill. App. 3d 978, 989 (2007).

¶ 44    Cassy's final contention is that counsel was ineffective for not calling her to testify at the best-interests hearing. The record shows that Cassy indicated she wished to testify, but after a five minute break, Cassy changed her mind and decided not to. From this, Cassy asserts that "either her counsel advised her not to testify or did not explain to her that testifying was her only chance of keeping her parental rights." She further states, "Just as there was no good that could have come of her testifying on [un]fitness, there was no harm that could have been done if she testified on best interests." We disagree.

¶ 45    Cassy's evaluation of trial counsel's performance shows that she has failed to "eliminate the distorting effects of hindsight" from her own arguments. See *Strickland*, 466 U.S. at 689. We

cannot simply assume that her testimony would have been helpful to her case at the best-interests hearing, particularly because at the best-interests stage "the full range of the parent's conduct can be considered." *In re C.W.*, 199 Ill. 2d 198, 217 (2002). Cassy simply has not made a sufficient record that would support her assertion that her testimony could have been helpful at best interests, or that her trial attorney prevented her from testifying. See *Knapp*, 2019 IL App (2d) 160162, ¶ 39.

¶ 46    As we have rejected all of Cassy's claims that her trial attorney's performance was deficient, we need not evaluate prejudice. See *Strickland*, 466 U.S. at 689. Furthermore, as we have found no error in the underlying proceedings, we need not evaluate Cassy's claim of cumulative error.

¶ 47                                    III. CONCLUSION

¶ 48    While the record demonstrates Cassy loves her children, and was consistent with visitation, Cassy failed in nearly every other aspect of this case. She barely started, let alone completed, substance abuse treatment, mental health treatment, and domestic violence counseling. Cassy never progressed beyond supervised visitation and failed to obtain or maintain safe housing for the children. While we have found no error in Cassy's counsel's performance, we are compelled to note that none of the alleged errors could have prejudiced Cassy in light of the overwhelming evidence concerning unfitness and best-interests. In sum, for the reasons stated, we affirm the judgment circuit court of Winnebago County.

¶ 49    Affirmed.